UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Docket No. 15-2863

SALEEM BEY,

Appellant,

v.

SUPERINTENDENT, State Correctional Institution at Greene,

Appellee

On Appeal from the July 8, 2015 Order of the United States District
Court for the Eastern District of Pennsylvania, Brody, J. (13-cv-5848)
Denying a Petition for Writ of Habeas Corpus

**APPELLANT'S INITIAL BRIEF
AND APPENDIX
Volume 1 of 5 (Pages A-1 through A-26)**

Michael Wiseman
Post Office Box 120
Swarthmore, Pennsylvania 19081
215-450-0903
Wiseman_Law@Comcast.Net

Attorney for Appellant
Saleem Bey

Dated:      May 1, 2016
            Swarthmore, PA

## PRELIMINARY STATEMENT REGARDING
## BRIEFING, CITATIONS, AND APPENDIX

A *Joint Appendix* is being filed along with this *Brief*. Entries from it are cited as "A" followed by the page number.

Appellant, Saleem Bey, was the Petitioner below and he is referred to by name or as Petitioner. Appellees were Respondents below and are referred to as "the Commonwealth."

Neither the Report and Recommendation of United States Magistrate-Judge, Timothy R. Rice, recommending the denial of habeas corpus petition, nor the District Court's one page order adopting the R&R, are published. Each are available on Westlaw, *Bey v. Folino*, 2015 WL 4130358 (E.D. Pa. July 9, 2015), and will be cited as *R&R* and *DCO*, with page references to *Joint Appendix*.

The Pennsylvania Superior Court issued two unpublished opinions relevant to this appeal: *Commonwealth v. Bey*, 1864 EDA 2006 (Pa.Super. May 12, 2008) (direct appeal opinion); *Commonwealth v. Bey*, 771 EDA 2011 (Pa.Super. June 1, 2012 (post-conviction opinion). They will be cited as *Bey 1* and *Bey 2*, respectively, with page references to the *Joint Appendix*.

The state trial court issued a post-conviction opinion relevant to the appeal. *Commonwealth v. Bey*, CP-51-CR-1206691-2001, CP-51-CR-1209051-2001 (CCP Phila. July 26, 2011). It will be cited as *TCO*.

All emphasis herein is supplied unless otherwise noted. Parallel citations are omitted.

# TABLE OF CONTENTS

Preliminary Statement Regarding
Briefing, Citations, and Appellate Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

Statement of Subject Matter and Appellate Jurisdiction . . . . . . . . . . . . . . . . . . .  1

Statement of the Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      A.    State Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

      B.    Federal Habeas Corpus Proceedings . . . . . . . . . . . . . . . . . . . . . . . .  3

      C.    Statement of Facts Relevant to the Issues on Appeal . . . . . . . . . . . .  4

            1.    Facts Related to the *Kloiber* Instruction . . . . . . . . . . . . . . . .  4

            2.    Facts Related to the *Doyle* Error . . . . . . . . . . . . . . . . . . . . . .  15

Statement of Related Cases and Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

I.   The Flawed *Kloiber* Instruction and Related Claims of Trial Counsel
     and Initial Post-Conviction Counsel Ineffectiveness . . . . . . . . . . . . . . . . . 19

     A.   The Instruction Given by the Trial Court Varied Materially From
          the Instruction Required Under Pennsylvania Law . . . . . . . . . . . . . 19

          1.   The Instruction Failed to Tell Jurors that They Could
               Receive Identification Testimony with Caution and What
               Factors Should Lead Them to Do So . . . . . . . . . . . . . . . . . . . 24

          2.   The Instruction Created an Unconstitutional
               Mandatory Presumption . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

     B.   Trial Counsel was Ineffective for Failing to Object to the
          Erroneous Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          1.   Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

          2.   Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     C.   Petitioner Presented Part of this Claim to the State Courts; As to
          the Unpresented Aspects, they are Procedurally Defaulted,
          However, Petitioner Shows Cause to Overcome the Default . . . . . . 32

     D.   AEDPA Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II.  The *Doyle* Error and Related Claims of Trial Counsel and Initial Post-
     Conviction Counsel Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

## Federal Cases

*Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Baker v. Barbo*, 177 F.3d 149 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bronshtein v. Horn*, 404 F.3d 700 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 17, 38

*Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Carter v. Kentucky*, 450 U.S. 288 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Coffin v. United States*, 156 U.S. 432 (1895) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Coleman v. Thompson*, 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Combs v. Coyle,* 205 F.3d 269 (6th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cristin v. Brennan*, 281 F3d 404 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Doyle v. Ohio*, 426 U.S. 610 (1976) . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 17, *passim*

*Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Francis v. Franklin*, 471 U.S. 307 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Freeman v. Class,* 95 F.3d 639 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Gray v. Lynn*, 6 F.3d 265 (5th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Harris v. Wood*, 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Hassine v. Zimmerman*, 160 F.3d 941 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 30

*In re Winship*, 397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 42

*Jermyn v. Horn*, 266 F.3d 257 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jordan v. Hedgpeth*,  No. CV-07-3461,
2011 WL 2160357 (C.D. Cal. May 27, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Jordan v. Hedgpeth*, No. CV -07–3461,
2011 WL 2149930 (C.D. Cal. May 31, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kyles v. Whitley* , 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Marshall v. Hendricks*, 307 F.3d 36 (3d Cir.2002) . . . . . . . . . . . . . . . . . . . . . . 17, 30

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) . . . . . . . . . . . . . . . . . 1, 18, 19, *passim*

*Miller–El v. Cockrell,* 537 U.S. 322 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 39

*Reed v. Ross*, 468 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ross v. District Attorney Allegheny County*, 672 F.3d 198 (3d Cir. 2012) . . . . . 17

*Sandstrom v. Montana*, 442 U.S. 510 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Smith v. Murray*, 477 U.S. 527 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Strickland v. Washington*, 466 U.S. 688 (1984) . . . . . . . . . . . . . 18, 29, 30, *passim*

*United States v. Lopez*, No. 14-461,
2015 WL 10692810 (3d Cir. April 20,  2016) . . . . . . . . . . . . . . . . . . . . . 39, 30, 42

*United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 30

*Virgin Islands v. Davis*, 561 F.3d 159 (3d Cir. 2009) . . . . . . . . . . 1, 40, 41, *passim*

*Williams v. Beard*, 637 F.3d 195 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Woodford v. Visciotti*, 537 U.S. 19 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**State Cases**

*Commonwealth v. Ali*, 10 A.3d 282 (Pa. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Commonwealth v. Bormack*, 827 A.2d 503 (Pa.Super. 2003) . . . . . . . . . . . . . . . 22

*Commonwealth v. Collins*, 70 A.3d 1245 (Pa.Super. 2013) . . . . . . . . . . . . . . . . . 22

*Commonwealth v. Gibson* 688 A.2d 1152 (Pa. 1997) . . . . . . . . . . . . . . . . . . . . . . . 22

*Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954) . . . . . . . . . . . 1, 4, 18, *passim*

*Commonwealth v. Randall*, 758 A.2d 669 (Pa. Super. 2000) . . . . . . . . . . . . . . . . 43

*Commonwealth v. Reid*, 99 A.3d 427 (Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Commonwealth v. Rollins*, 738 A.2d 435 (Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . 21

*Commonwealth v. Trivigno*, 750 A.2d 243 (Pa. 2000) . . . . . . . . . . . . . . . . . . . . . 33

*Commonwealth v. Walker*, 93 A.3d 766 (Pa. 2014) . . . . . . . . . . . . . . . . . . . . . . . 22

**Statutes**

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 28, 37, 38

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

This is an appeal of the District Court's denial of a *Petition for a Writ of Habeas Corpus*. There is federal jurisdiction, 28 U.S.C. §§ 2241, 2254, and appellate jurisdiction. 28 U.S.C. §§ 1291, 2253. A *Certificate of Appealability* (COA) was issued by this Court.

## STATEMENT OF THE ISSUES

A *Motions Panel* of this Court issued a COA on the following four questions:

1.  whether Bey's trial attorney was ineffective for failing to object to a faulty *Kloiber* instruction ("Claim Two" below), see *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954);

2.  whether any procedural default of that issue should be excused because postconviction counsel was ineffective for failing to properly argue the issue of trial attorney ineffectiveness, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012);

3.  whether Bey's trial attorney was ineffective for failing to object on proper grounds to the prosecutor's comments on Bey's post-arrest, post-Miranda silence ("Claim Four" below), *see Doyle v. Ohio*, 426 U.S. 610 (1976); *Government of Virgin Islands v. Davis*, 561 F.3d 159 (3d Cir. 2009); and

4.  whether the procedural default of that issue should be excused because post-conviction counsel was ineffective for failing to raise the issue, *see Martinez*, 132 S. Ct. at 1320.

A-25-A-26.

# STATEMENT OF THE CASE

## A.     State Court Proceedings

Petitioner, Saleem Bey, was arrested and charged under Philadelphia County docket numbers CP-51-CR-1209051-2001 and CP-51-CR-1206691-2001 (CCP Phila.), with the November 24, 2001, shooting of Kenneth Thompkins and Terry Swanson – Mr. Swanson died, and Thompkins was wounded.

Petitioner was tried in 2004 but a mistrial was declared because the jury could not reach a verdict.

Mr. Bey was retried in 2005.  He was convicted on December 15, 2005.  He was subsequently sentenced to life imprisonment without parole.

His direct appeal was denied by the Superior Court of Pennsylvania on May 12, 2008.  *Bey 1*; A-27-A-36.  Leave to appeal to the Pennsylvania Supreme Court was denied on November 20, 2008, *Commonwealth v. Bey*, 298 EAL 2008 (Pa.Super. 2008).

Petitioner, through counsel, filed a petition under the Pennsylvania Post-Conviction Relief Act (PCRA) on October 13, 2009.  A-37-A-66.  The petition was ultimately dismissed without a hearing.  Petitioner appealed to the Superior Court, which affirmed the dismissal on June 1, 2012.  *Bey 2*, A-68-A-75.  Leave to appeal to the Pennsylvania Supreme Court was sought and denied on June 5, 2013,

2

*Commonwealth v. Bey*, 329 EAL 2012 (Pa. 2013).

Petitioner was represented at his 2004 mistrial by Brian McMonagle and at the 2005 trial by Jack McMahon.  Norris Gelman represented him on direct appeal and in post-conviction proceedings.  The Commonwealth throughout was represented by the District Attorney of Philadelphia.  The Honorable John J. Poserina, Jr. presided over trial and the Honorable Teresa M. Sarmina presided during PCRA proceedings.

### B.    Federal Habeas Corpus Proceedings

Undersigned counsel filed a timely *Petition for a Writ of Habeas Corpus* on October 14, 2016 alleging multiple constitutional violations.  *Bey v. Folino*, 13-5848 (E.D. Pa.) (Brody, J.).

The matter was referred to the Honorable Timothy R. Rice, United States Magistrate-Judge.  Following the Commonwealth's *Response*, Petitioner's *Reply*, and sur-replies filed by each side, Magistrate Rice issued a *Report and Recommendation* on December 31, 2014; A-3-A-20.  The *R&R* recommended that the *Petition* be dismissed without a hearing and that no COA issue.  A-19.

On February 27, 2015, Petitioner filed timely *Objections* to the *R&R*.  The Commonwealth responded on April 27, 2015.  Petitioner replied on May 22, 2015.

The District Court issued a one page order on July 9, 2015 adopting the *R&R* in toto.  A-3.

3

A timely notice of appeal was filed by Petitioner on August 3, 2015.  A-1.

Petitioner filed a *Motion for a Certificate of Appealability and Consolidated Brief in Support* on August 26, 2015.  The Commonwealth filed an *Objection* to the *Motion* on September 4, 2015.  COA was granted by a Panel of this Court on February 17, 2016.  A-25-A-26.  This *Brief* follows.

### C.    Statement of Facts Relevant to the Issues on Appeal

### 1.    Facts Related to the *Kloiber* Instruction

Philadelphia Police Officer Daniel Taylor was assigned to traffic and crowd control near 6th and Spring Garden Streets in Philadelphia at about 3:20 a.m. on November 24, 2001, along with his partner, Sargent Michael Walton.  Crowds and traffic were exiting two after-hours clubs (the Transit and the Palmer) and parking lots in the area of the intersection.  The Transit is on the southwest corner and the Palmer is on the northwest.  NT 12/9/05, 52-53; A-148-A-149.[1]

Just before the shooting, Taylor and Walton were standing at the mouth of the driveway adjacent to Spring Garden Street, when Eagles quarterback Donovan

---

[1]Commonwealth trial exhibit C-1 is a diagram of the area.  It was marked as an exhibit (NT 12/9/2005, 56, A-152), and was admitted (NT 12/14/2005, 24, A-786) It is included in the *Appendix* (A-76) as an aid to understanding the movement and observations of the witnesses.  As explained by Officer Taylor, Spring Garden Street is on the "top" of the diagram, which is north.  Sixth Street (not depicted on the diagram) is to the "right of the diagram or to the east" running north-south.  (NT 12/9/2005, 57-58, A-153-A-154).

McNabb left the Palmer Club at about 3:22 and crossed Spring Garden Street diagonally. The two officers greeted him as he passed, and watched him, standing side-by-side, as he proceed south through the parking area. *Id.*, 58-60, 63; A-154-A-160, A-159. As the police waited for "the crowd to come and clear out" Taylor heard a shot. *Id.* 64; A-160. The shot was "in front of" Taylor as he faced south. *Id.* He was not able to see who fired the first shot, although he saw the muzzle flash. *Id.* 64, 69, A-160-A-165.

Taylor moved towards the shot (south) and to his left (east), took cover near a parked car and drew his weapon. Walton moved to the right (west). *Id.*, 66; A-162. Cars were parked on both sides of the driveway. *Id.* Although five cars were marked on C-1, there were other parked vehicles at the time not depicted on the diagram. *Id.* As he took his position near the parked car he heard four to six more shots and saw the muzzle flashes. *Id.*, 70; A-166. About 20 to 30 people at the time were running away. *Id.*, 71; A-167.

Taylor then saw two men running northbound toward him. One was wearing blue jeans and the other a gray sweat suit. *Id.*, 72; A-168. Taylor claimed that he saw the man in the gray sweat suit shoot the man in the blue jeans in the back of the head. The shooter was identified as Petitioner. *Id.*, 74; A-170. The witness claimed that Petitioner then continued to run northbound and Taylor "ran right past him" and to

his (Petitioner's) left and crouched near that vehicle depicted on the diagram as the Toyota [sic] Maxima, located near the entrance to Spring Garden Street. *Id.*, 75-76; A-171-A-172.

Despite then being near the exit to the lot onto Spring Garden, according to Taylor, Petitioner began to move southbound along the wall. *Id.*, 82; A-178. He then noticed two other officers (Ferrero and Sweeney) moving toward him. *Id.*, 86; A-182. As all of the officers moved toward Petitioner, he was arrested. *Id.*, 90; A-186.

Sergeant Walton, testified that Taylor was in a position to see the shooting because of an encounter with Philadelphia Eagles quarterback, Donovan McNabb: while the two officers were on an island in the middle of Spring Garden Street directing traffic, they followed McNabb as he existed the Palmer Club (on the north side of Spring Garden), crossed Spring Garden, and headed south into a driveway behind the Transit Club. The two officers stopped at the northern mouth of the driveway with Taylor facing south toward the driveway and Walton facing north, just second before shots rang out further south in the driveway. NT 12/12/05, A-429.

The defense pointed out numerous inconsistencies that called into question the accuracy of Taylor's identification testimony. In closing argument, defense counsel framed the impact of these inconsistencies on the accuracy of the identification:

6

> I don't doubt for a second that today, as Officer Taylor sits here, he believes, his perception is that Saleem Bey is the shooter, that the events that occurred in the exciting, confusing way and where the gun being found and where Mr. Bey ran to, it is his belief and perception that Mr. Bey is the shooter.

NT 12/14/05, 87; A-855.

**First,** neither Taylor's preliminary hearing testimony nor his statement to homicide detectives on the night of the shooting, made reference to seeing or following McNabb, thus ending up at the mouth of the driveway just seconds before the shooting began. In both accounts, Taylor said that he was directing traffic out of the driveway when he heard gunshots. NT 12/12/01, 6-7; A-82-A-83 (preliminary hearing); NT 12/9/05, 117; A-213 (statement). Moreover, Sergeant Walton's statement to the detectives on the night of the shooting said:

> At about 3:25 a.m. myself and Officer Taylor were on crowd and traffic control for the clubs at 6th and Spring Garden Streets. Both east and westbound traffic on Spring Garden Street were closed. We heard one and then a series of gunshots coming from the rear parking lot of Transit Club which is located at 600 Spring Garden Street. I notified Police Radio of the reports of gunshots. *We proceeded to the opening of the parking lot* and we still heard gunshots as we entered the parking lot.

Walton Statement, 11/24/01; A-308-A-309; NT 12/12/05, 133-135; A-451-A-453.

At trial, Walton testified that his statement meant that he and Taylor proceeded to the mouth of the parking lot, *after* hearing gunshots. NT 12/12/05, 135; A-453. Taylor's statement, given just hours after the shootings, was ambiguous about his

7

location when he heard the shots, and Walton's statement placed the two in a completely different location. The McNabb story, placing Taylor in a prime location to view the shooting, did not appear until the 2004 trial.

**Second,** Taylor also testified inconsistently about which victim he saw get shot. In his statement to the detectives, he said that the person he saw get shot was later pronounced dead. Taylor Statement 11/24/01.[2] In his preliminary hearing testimony, Taylor was also clear that the person he saw get shot was the deceased victim. NT 12/12/01, 9; A-105.

However, at the 2005 trial, on direct examination, Taylor said only that he saw a man in a black jacket and blue jeans get shot. NT 12/9/05, 73-74; A-169-A-170. When cross-examined on this point, Taylor said that he could not say for certain which victim he saw shot because they were wearing similar clothing and both got shot in the back. *Id.*, 140-141; A-236-A-237. Taylor was certain that whomever he saw get shot was shot in the back of the head. *Id.*, 135-136; A-231-A-232. The identity of the victim would not be particularly critical, except that trial evidence suggested that if Taylor was accurate about not seeing the first victim get shot and seeing the second victim get shot as he was chased northbound, then the only person

---

[2]This was corroborated by Walton's statement in which he related that Taylor told him that he saw Swanson (the deceased) get shot.

whom Taylor could have seen shot was Thompkins.[3]  But, Thompkins did not get shot in the back of the head.  NT 12/13/05, 55; A-588.

**Third,** Taylor repeatedly testified that he heard one shot, then a series of shots coming from further south in the driveway but that he did not see any aspect of these first two series of shots except for the muzzle flashes.  NT 12/9/05, 63-65, 68-70, 13-135, 137; A-381, A-383, A-386-A-388, A-452-A-453, A-455.  The only shot that Taylor saw fired was the last bullet, which he said struck a man running northbound about 15-30 feet in front of him.  *Id.*, 72-75; 134, 161; A-168-A-171, A-230, A- 257.  Among the many questions about his testimony, it is hard to fathom how Taylor did not see any of the earlier shots when he was facing in that direction before the shots began.  He testified that the driveway was clear of other people, he and others testified that the lighting was good and the victims were found lying about 15 feet from each other.  NT 12/9/05, 99-101; A-195-A-197 (Taylor on lighting); NT 12/13/05, 195-207, A-727-A-739 (Officer Trenwith on lighting); Taylor Statement 11/24/01, A-306 (victims found 15 feet apart); Bevidas Statement, 11/24/01 (victims 10 feet apart); Sweeney Statement 11/24/01 (15 feet).

**Fourth,** yet another inconsistency arose from Taylor's statement to homicide

---

[3]Mr. Swanson's body was found next to the *southernmost* bullet casing – further south than where Taylor said he saw the shooting.  NT 12/13/05, 8-.9; A-541-A-542 (crime scene testimony).

9

detectives hours after the shooting. Officer Taylor said that he *did* see aspects of the first series of shots: "It happen [sic] so fast, it appeared that the male who I saw get shot was facing my direction, and the shooter came up from behind him. When I first heard the gunshots, I observed the black male, who was transported to Jefferson Hosp., laying on the ground with blood near him." Taylor Statement, 11/24/01; A-306. This of course contradicts the sequence of events to which he testified that he did not see anybody shooting or being shot until the end of the incident.

**Fifth,** there were also inconsistencies in Taylor's description of the events with respect to his encounter with the suspect immediately after the last shot. On direct examination, he testified that "Bey continued to run north in my direction. I ran right past him," and that the suspect was not looking at him. NT 12/9/05, 75; A-171. The prosecutor ignored Taylor's testimony about running past the suspect as he ran north past Taylor. Instead, he asked Taylor again what he did while the suspect ran north, and Taylor responded: "[A]s he got within 15 feet of me, I had my weapon already drawn. I was in uniform. I began to shout at him, police, drop the gun. . . He immediately looks up . . . That was the initial first eye contact that I had. He looks right at my face . . . As I looked up, as I was yelling at him, he made like an expression of surprise. His eyes got really big. . . We made complete eye contact. He immediately ran to his left . . Away from me [toward] vehicles parked [along a

10

wall]." *Id.*, 76-78; A-172-A-174. Thus, from one page to the next, Taylor's testimony was again highly inconsistent with respect to eye contact and the direction of flight. This was inconsistent with Officer Ferrero testimony that he say Taylor chase the suspect southbound through the driveway before the suspect cut west toward the parked cars along the wall. NT 12/12/05, 16-18; A-334-A-336.

**Sixth,** there was inconsistent testimony on whether the suspect went to the location where the murder weapon, a .380-caliber handgun, was later found: the driver's side of a Nissan Maxima. Officer Taylor was certain that when the suspect went behind the parked cars and crouched behind the passenger side of the Nissan Maxima, "He never made it to the other [driver's] side of the car." NT 12/9/05, 161; A-257.

This is consistent with Sergeant Walton's testimony that he watched from behind the driver's side of the Maxima as the suspect crouched northbound toward him behind the parked cars but at some point lost sight of him. NT 12/12/09,122-123; A-440-A-441. However, it is inconsistent with Officer Ferrero's testimony that he watched the suspect crouch his way from the passenger's side to the driver's side of the Maxima. *Id.* at 23; A-341.

**Seventh**, there was inconsistency as to whether any civilian witnesses to the shootings remained on the scene. Taylor said that after securing Petitioner, he went

back up the driveway, noticed the two victims, but that in terms of civilian witnesses "everybody that was there was pretty much gone . . ." NT 12/9/05, 148; A-244. Officer Ferrero said that after Petitioner was taken into custody, police closed off the driveway, not letting anyone enter or exit, and that there were civilians around but when asked if they saw anything "most of them just said no." NT 12/12/05, 34-35, 48-50; A-352-A-353, A-366-A-368.  Officer Michael Givens testified that he arrived on the scene after Petitioner was taken into custody and that there were about 50 civilians gathering around, though "[everyone] that [he] talked to didn't want to be involved." *Id.,* 98, 104-105; A-416, A-422-A-423.  Sergeant Wilson, who transported Kenneth Thompkins to the hospital, provided a statement, which said, "I spoke to a black female, her name was Shanice, I recognized her from being at the crime scene. She told me she was there when the shooting happened. She said I saw [the performer] Beanie Sigal pulling away in his Bently [sic] from the parking lot when the shooting happened. I informed the detective that Shanice was a witness." Sergeant Wilson also said that when he arrived on the scene, after the suspect had been taken into custody, "[t]here was a large crowd and people were in every direction and the vehicle traffic was heavy." *See* Wilson Statement.

**Eighth,** the police investigation left a number of gaps that raised questions about the accuracy of the identification.  Several police officers testified about trying

to locate civilian witnesses among the crowd gathered right after the shooting, but that "most of the [civilians] just said no [they hadn't seen anything], NT 12/12/05, 49-50; A-367-A-368 (Ferrero), [or gave] a negative response," *Id.*, 128; A-446 (Walton), or "didn't want to be involved" *Id.*, 104-105; A-422 (Officer Givens). Allowing potential homicide witnesses to depart under these circumstances is problematic, but pales in comparison to Ferrero's testimony that there was an *occupied* SUV parked right in front of and facing the shootings that was blocking his and Officer Sweeney's approach. But nobody stopped the SUV from departing, even though Ferrero recalled that Sweeney removed a baseball cap from the hood of the SUV as it began to pull away. *Id.*, 10, 35, 67; A-328, A-353, A-385; *see also*, NT 12/9/05 87, 170; A-183, A-265 (Taylor).

Another potential witness who was permitted to leave the scene was a man who ran into Walton while the Sergeant was on the driver's side of the Nissan Maxima watching the shooter crouch behind the passenger side. Walton testified that he lost sight of the shooter so he headed back east toward the front of the car to look for the suspect when a man who was running west collided with him with such force that two of Walton's teeth were knocked out. NT 12/12/05, 123-124; A-441-A-442. Walton threw this man to the ground, but once he believed it was not the shooter, he let the man go. Considering that only Taylor claims to have seen Petitioner with a gun, the

13

identity of this unknown man was critical, particularly since his collision with Walton

occurred in proximity to where the murder weapon was recovered.  *Id.*, 124-148, 153;

A-442-A-466; A-471.

The police also neglected to test for the presence of gunpowder residue on

Petitioner because, according to Crime Scene Unit Detective Wilson, such testing was

of no utility because Petitioner's hands were not bagged, and there was therefore a

chance of a false positive.  NT 12/12/05, 206; A-523.  Wilson stated that the testing

was not done to protect the rights of Mr. Bey.  NT 12/13/05, 37-38; A-570-A-571.

That these inconsistencies and investigative gaps were important is evidenced

by the fact that the jury the jury sent out two notes related to the identification

testimony of Officer Taylor.  The notes read:

- May we have or hear the transcript of Officer Taylor's testimony describing from the time the officer heard the first shot to when defendant ran west towards the wall?  NT 12/15/01, 30; A-1041; and

- May we also have [the] statement where Officer Taylor says he saw the defendant shoot Swanson?  *Id.*, 37; A-1048.

These notes show that at least a portion of the jury was not certain of the

identification.[4]

---

[4]The court did not comply with these requests and the jury returned a verdict the same day. 12/15/05, 34-37; A-1045-1048.

### 2.    Facts Related to the *Doyle* Error

At trial, Kenneth Thompkins testified that he did not see who shot him or Mr. Swanson because it was dark and he was shot from behind. NT 12/13/05 55.20-56.10. His testimony was consistent with a police statement that he provided to the police the day of the shooting at 2:15 p.m., while at the hospital. *Id.* at 145.6-146.11; *see also* Thompkins Statement, 11/24/01; A-310.

On April 4, 2002, roughly five-and-a-half months after the shooting, Mr. Thompkins gave a statement to then-defense counsel Brian McMonagle in which Mr. Thompkins identified the shooter as a "big dark skin bald headed guy with a beard." He specifically indicated that Petitioner was not the shooter. *Id.* at 60.3-65.9, 68.8-13; *see also* Thompkins Statement, 4/4/02.[5]

During closing argument, the prosecutor argued that Thompkins' statements to prior defense counsel – which described the shooter and specifically denied that it was Petitioner – were untrue because Petitioner did not provide the statements to the prosecutor until just before the start of trial. The prosecutor began:

> [Thompkins] goes to Mr. McMonagle's office and he gives this statement to Mr. McMonagle back in 2002, a statement which, if it is to be believed, if it is to be believed, this is an innocent man, a statement

---

[5]Mr. Thompkins gave a second statement to Mr. McMonagle's private investigator, Diane Cowan, similar to the one he had given to Mr. McMonagle. NT 12/13/05, 68-71; A-600-A-603; *see also* Thompkins Statement, 5/7/04, A-317.

saying that he's an innocent man, and I don't get this until Friday last week.

NT 12/14/05, 231-232; A-999-A-1000.

The court sustained defense counsel's objection, ruling, "I told the jury it is their own recollection," *id.* at 232-233; A-1000-A-1001, but the prosecutor continued:

> Fine. There is no obligation to give it to me. Fine. Okay. There isn't. There isn't. Okay. But if this is the truth, if this is to be believed, if that's an innocent man, why wouldn't you give it to law enforcement or the prosecutor who has the power to reinvestigate a case where there might be a mistake? You don't think that happens. It happens. Who brought the charges? Who has the power to drop the charges and withdraw the prosecution? I do. Me. My office. Why wouldn't you want to tell me about this so we could reinvestigate it? Why wouldn't you?

*id.* at 233-234; A-1001-A-1002.  Trial counsel objected to this argument on the ground that the rules of discovery did not require such disclosure.  *Id.*

In another portion of closing argument, the prosecutor posed the following rhetorical questions that constituted comments related to Mr. Bey's exercise of his right to remain silent:

> Now, that's something the jury is going to want to know, why did you run from the police, Saleem? Why did you make them chase you? Why were you ducked down and crouched behind cars? Why were you hiding? Why were you trying to conceal yourself? Why?

NT 12/14/05, 206-207; A-974-A-975.  This comment was not the subject of a trial

16

objection.

Trial counsel failed to object to any of the three arguments on Due Process and/or *Doyle* grounds. Similarly, direct appeal and initial PCRA counsel ineffectively failed to raise any challenge to any of these comments

## STATEMENT OF RELATED CASES AND PROCEEDINGS

To counsel's knowledge, there are no other related cases or proceedings.

## STANDARD OF REVIEW

The Court conducts plenary review of a district court's denial of a habeas corpus petition without a hearing. *Marshall v. Hendricks*, 307 F.3d 36, 50 (3d Cir.2002); *Ross v. District Attorney Allegheny County*, 672 F.3d 198, 205 (3d Cir. 2012).

The District Court's ruling that the merits of Petitioner's claims were procedurally defaulted, is also subject to this Court's plenary review. *Albrecht v. Horn*, 485 F.3d 103, 114 (3d Cir. 2007).

AEDPA applies to this claims raised herein, except for those claims or portions of claims that were procedurally defaulted and for which there is no state court decision on the merits. As to those claims, or portions of claims, review is *de novo*. *Bronshtein v. Horn*, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005).

**SUMMARY OF ARGUMENT**

The trial court's instructions on how the jury should evaluate the identification testimony bore little resemblance to the pattern instruction required by *Kloiber*. This instruction – which is supposed to advise the jury to consider exercising "caution" in its evaluation of the identification testimony – did the opposite. Among other flaws, it told the jury that if the identification witness was positive about his identification, than the "identification **may not** be received with caution."

Trial counsel failed to object to any portion of the instruction. This was ineffective under *Strickland v. Washington*, 466 U.S. 688 (1984). Initial post-conviction counsel challenged a portion of the flawed instruction. As to those portions of the instruction that went unchallenged by initial post-conviction counsel, those portions are procedurally defaulted and there remains no available state remedy upon which Petitioner can challenge them. However, Petitioner overcomes the default of those portions pursuant to *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), based on the ineffective failure of initial post-conviction counsel to challenge them.

In a second constitutional violation, the trial prosecutor thrice commented during his closing argument upon Petitioner's post-arrest silence, including not testifying during trial. Trial counsel objected to some of these comments, however, he never raised the constitutional ground that such comments were improper under

18

*Doyle v. Ohio*, 426 U.S. 610 (1976), or due process of law.  Initial post-conviction counsel also failed to challenge Petitioner's convictions on these grounds, thus providing *Martinez*-cause to overcome their default.

**ARGUMENT**

## I.    THE FLAWED *KLOIBER* INSTRUCTION AND RELATED CLAIMS OF TRIAL COUNSEL AND INITIAL POST-CONVICTION COUNSEL INEFFECTIVENESS

Petitioner was entitled to and ostensibly received a jury instruction regarding the unreliability of the eyewitness testimony presented against him.  Unlike a proper *Kloiber* instruction, that is designed to have a juror consider whether to evaluate identification testimony with "caution," the instructions provided here failed to do so, and in fact, told the jury the opposite, going so far as creating a conclusive presumption against Petitioner, in violation of due process of law.   Trial counsel, however, ineffectively failed to object to erroneous portions of the instruction.  Initial post-conviction raised some, but not all of the errors, in PCRA proceedings.

### A.    The Instruction Given by the Trial Court Varied Materially From the Instruction Required Under Pennsylvania Law

The Pennsylvania Suggested Standard Criminal Jury Instructions provide two instructions on eyewitness identification testimony: (1) § 4.07A, "Identification Testimony – Accuracy Not in Doubt," and (2) 4.07B, "Identification Testimony –

19

Accuracy in Doubt." The latter instruction, 4.07B, "is dictated by the principles set forth in *Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954)" (§ 4.07B, *Advisory Committee Note*), and is called a *Kloiber* instruction.

As demonstrated herein, the instruction given bore little resemblance to either a *Kloiber* instruction, or even the instruction that is designed for when accuracy is not in doubt – *i.e.* § 4.07A.[6]

---

[6]§ 4.07A (Crim) Identification Testimony – Accuracy Not in Doubt, states:

1.    In [his] [her] testimony, *[name of witness]* has identified the defendant as the person who committed the crimes. In evaluating [his] [her] testimony, in addition to the other instructions I will have provided to you for judging the testimony of witnesses, you should consider the additional following factors:

a.    Did the witness have a good opportunity to observe the perpetrator of the offense?

b.    Was there sufficient lighting for [him] [her] to make [his] [her] observations?

c.    Was [he] [she] close enough to the individual to note [his] [her] facial and other physical characteristics, as well as any clothing [he] [she] was wearing?

d.    Has [he] [she] made a prior identification of the defendant as the perpetrator of these crimes at any other proceeding?

e.    Was [his] [her] identification positive or was it qualified by any hedging or inconsistencies?

f.    During the course of this case, did the witness identify anyone else as the perpetrator?

2.    In considering whether or not to accept the testimony of *[name of witness]*, you should consider all of the circumstances under which the identifications were made. Furthermore, you should

20

Pennsylvania law has long held that a jury should be provided with a cautionary instruction when the trial court believes there may be infirmities in the identification testimony of a witness:

> Where the witness is not in a position to clearly observe the assailant, or he is not positive as to identity, or his positive statements as to identity are weakened by qualification or by failure to identify defendant on one or more prior occasions, the accuracy of the identification is so doubtful that the Court should warn the jury that the testimony as to identity must be received with caution.

*Commonwealth v. Kloiber,* 106 A.2d 820, 826–27 (Pa 1954).  The Pennsylvania Supreme Court has recently reaffirmed the circumstances under which such an instruction is required:

> A *Kloiber* charge is appropriate where there are special identification concerns: a witness did not have the opportunity to clearly view the defendant, equivocated in his identification of a defendant, or had difficulty making an identification in the past. *Commonwealth v. Rollins*, . . . 738 A.2d 435, 448 n. 14 (Pa. 1999); *Commonwealth v. Gibson*, . . . 688 A.2d 1152, 1163 (Pa. 1997).

---

consider all evidence relative to the question of who committed the crime, including the testimony of any witness from which identity, or non-identity of the perpetrator of the crimes may be inferred. You cannot find the defendant guilty unless you are satisfied beyond reasonable doubt by all the evidence, direct and circumstantial, not only that the crime was committed but that it was the defendant who committed it.

21

*Commonwealth v. Reid*, 99 A.3d 427, 448 (Pa. 2014).[7]

Pennsylvania Suggested Jury Instructions, §4.07B sets forth two potential *Kloiber* instructions: 1) when the witness' identification "must" be considered with caution; and, 2) when the need for caution is a jury question. The circumstances of this case invoke the second – the trial court meant to instruct the jury that it was its determination as to whether caution was required.

The following side-by-side comparison of a proper *Kloiber* instruction to be given when the exercise of "caution" is left to the jury, with that provided by the trial court (NT 12/15/05, 15-16; A-1025-A-1027), demonstrates the flaws in the trial court's instructions:

---

[7]*See also*, *Commonwealth v. Ali*, 10 A.3d 282, 303 (Pa. 2010) (*quoting Commonwealth v. Gibson*, 688 A.2d 1152, 1162 (Pa. 1997); *Commonwealth v. Walker*, 93 A.3d 766, 795 (Pa. 2014) (Castille, CJ, *dissenting*: in response to majority opinion permitting use of expert testimony to challenge identification testimony, referring to the *Kloiber* instruction as "time-tested"); *Commonwealth v. Collins*, 70 A.3d 1245, 1255-1256 (Pa.Super. 2013); *Commonwealth v. Bormack*, 827 A.2d 503, 507-508 (Pa.Super. 2003).

| **Pa. Suggested Jury Instr. §4.07B** | **Trial Instruction** |
|---|---|
| 1. In [his] [her] testimony, *[name of witness]* has identified the defendant as the person who committed the crime. There is a question of whether this identification is accurate. | Where a witness is positive of his identification, such as where the opportunity for positive identification is good and the witness is positive in his identification and the identification has not been weakened by any prior failure to identify but remains even after cross-examination positive and unqualified, **the testimony as to identification may not be received with caution**. **Indeed, positive testimony as to identity may be treated as a statement of fact.** On the other hand, if you believe that a witness is not in a position to clearly observe and was not in a position because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person actually had the opportunity to observe that which he testified to and a positive identification of a defendant by one witness is sufficient for a conviction. |
| 2. A victim or other witness can sometimes make a mistake when trying to identify the criminal. If certain factors are present, the accuracy of identification testimony is so doubtful that a jury must receive it with caution. . . . [the instruction then lists a number of factors] | |
| 3. If you believe that [this factor is] [one or more of these factors are] present, then you must consider with caution *[name of witness]*'s testimony identifying the defendant as the person who committed the crime. If, however, you do not believe that [this factor] [at least one of these factors] is present, then you need not receive the testimony with caution; you may treat it like any other testimony. . . . | |

The instruction given by the court also did not resemble the suggested instruction when "Accuracy is not in Doubt" per § 4.07A.

In this case, where Petitioner was identified by a single witness (Officer Taylor) and his identification was marred by various inconsistencies, the scene was

23

crowded and chaotic and Petitioner had a mistrial in his 2004 trial because the jury could not reach a verdict, the instruction provided by the trial court was flawed in two significant respects.

### 1. The Instruction Failed to Tell Jurors that They Could Receive Identification Testimony with Caution and What Factors Should Lead Them to Do So

Unlike the model instruction, which begins by advising jurors that the identification's accuracy is in question, the given instruction began with what to do if the officer was positive and never told jurors that the identification's accuracy was in question. The model instruction then lists several factors which can undermine the accuracy of an identification and twice tells the jury that if it finds any one of these factors, it "must" receive eyewitness testimony with caution.[8]

---

[8]The factors which trigger the need for a *Kloiber* instruction, include:

[if the witness because of bad position, poor lighting, or other reasons did not have a good opportunity to observe the criminal]

[if the witness in [his] [her] testimony is not positive as to identity]

[if the witness's positive testimony as to identity is weakened

    [by qualifications, hedging, or inconsistencies in the rest of [his] [her] testimony]

    [by [his] [her] not identifying the defendant, or identifying someone else, as the criminal [at a lineup] [when shown photographs] *[give specifics]* before the trial]]

The instruction given by the court, however, listed only one accuracy factor—"lighting and/or conditions," failing to mention other applicable factors, such as position of the witness, opportunity to view, and inconsistencies with the identification.  Even then, it did not tell jurors that if they found the lighting factor present, they must receive eyewitness testimony with caution, or even that they *may* receive it with caution.  Instead, the instruction provided the following vague, circular and essentially useless directions: "if you believe that a witness is not in a position to clearly observe . . . because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person had the opportunity to observe."

The instruction given – omitting the relevant accuracy factors and any mention of caution – did not convey either the criteria that should be used by a jury to evaluate suspect identification testimony, or that if such criteria were found to exist, that the testimony may be received with caution.

---

[if, before the trial, the defendant's request for a [lineup] *[specify request]* to test the ability of the witness to make an identification was denied and the witness subsequently made a less reliable identification]

[if, *[give specifics]*].

Pa. Suggested Jury Instr. §4.07B.

### 2.    The Instruction Violated *Kloiber* by Creating an Unconstitutional Mandatory Presumption

Additionally, the trial court actually instructed the jury that it may **not** receive with "caution" Taylor's identification testimony, but to accept it as true if Taylor was certain of it. Contrary to the model instruction, which tells jurors that if they do not find any of the enumerated factors meriting "caution," they "need not" view the identification testimony with caution, the instruction given told jurors that they "may not" receive the identification testimony with caution. The court's instruction thus provided a far more mandatory instruction, using "language of command" than that required by the pattern instruction.

Moreover, the given instruction's predicate to making the identification unassailable did not require jurors to exclude factors undermining eyewitness testimony accuracy. To set up the conclusive presumption, jurors had only to find that "the witness is positive of his identification testimony" and "remains even after cross-examination positive and unqualified." Thus, the trial court told jurors that so long as Officer Taylor testified that the shooter whom he saw was Petitioner (*i.e.* the witness was "positive") and never said it could be anybody else (*i.e.* the testimony was "unqualified"), they "may not" accept the testimony with caution, but must accept his identification. As Officer Taylor repeatedly testified that he was sure of the

shooter's identity, the trial court essentially directed a guilty verdict as to the key contested element at trial – the identity of the shooter.

In addition to running counter to the required concepts that jurors are free to receive the identification with caution, the given instruction violated Petitioner's due process rights by creating a conclusive presumption on an ultimate issue at trial, *i.e.*, the shooter's identity.

A conclusive presumption as to an element of the offense removes the prosecution's burden to prove every element beyond a reasonable doubt, violating the Fourteenth Amendment's Due Process Clause. *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (*citing In re Winship*, 397 U.S. 358, 364 (1970)). A conclusive presumption is created by "language of command" which tells jurors they have no choice but to find an ultimate fact based on finding lesser predicate facts. *Francis v. Franklin*, 471 U.S. 307, 316 (1985). "[T]he federal constitutional question is whether a reasonable juror could understand" the instruction as requiring a finding on an ultimate fact. *Id. Franklin* and *Sandstrom* each held that instructing the jury to "presume" the ultimate fact of intent violated due process because the jury may have interpreted the presumption as conclusive or as shifting the burden of proof to the defendant to rebut the presumption. 442 U.S. at 524; 471 U.S. at 325.

The plain-English command of the instruction given in Petitioner's case –

27

"testimony as to identification **may not** be received with caution" – could even more clearly convince a reasonable juror that the only finding needed to establish the shooter's identity was the eyewitness' certainty. Requiring the prosecution to prove only that Officer Taylor appeared certain, not that Petitioner was the shooter, denied Petitioner his due process right to require the prosecution to prove every element beyond a reasonable doubt.[9]

This error was magnified by the instruction's next sentence, which told jurors that "positive testimony as to identity may be treated as a statement of fact"; the instruction's last sentence, which told jurors that "a positive identification of a defendant by one witness is sufficient for a conviction"; and the instruction's overall failure to note that identification testimony may be received with caution and to list the proper factors for questioning the testimony's accuracy.

---

[9]*Compare Jordan v. Hedgpeth*, No. CV-07-3461, 2011 WL 2160357, at *8 (C.D. Cal. May 27, 2011) (magistrate's report on § 2254 habeas petition) ("The 'witness certainty' portion of [the eyewitness identification jury instruction] is framed in neutral terms and is merely one of twelve factors listed in the instruction. It does not require that a jury infer from an eyewitness's certainty about his or her identification that the eyewitness therefore correctly identified the defendant as the perpetrator. *Consequently*, [the instruction] does not involve a constitutionally impermissible presumption that lessens the prosecutor's burden of proof. *See, e.g. Francis v. Franklin*, 471 U.S. 307, 314-15 (1985) . . . . Nor does the instruction impose an 'irrebuttable direction by the court.' *Sandstrom v. Montana*, 442 U.S. 510, 517 (1979)."), *accepted by Jordan v. Hedgpeth*, No. CV -07–3461, 2011 WL 2149930 (C.D. Cal. May 31, 2011).

28

**B.    Trial Counsel was Ineffective for Failing to Object to the Erroneous Instructions**

Trial counsel's failure to object to the erroneous instructions is reviewed under the family two prong test of *Strickland v. Washington*, 466 U.S. 688 (1984). Petitioner must show (a) counsel's deficient performance, *i.e.*, that his attorney's performance fell below "an objective standard of reasonableness," *id.*, 688; and (b) prejudice, *i.e.*, that there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**1.    Deficient Performance**

Petitioner's trial counsel was ineffective for not recognizing and objecting to these obvious errors, especially in a case turning on one eyewitness' questionable identification testimony.   Indeed, counsel have been held ineffective in habeas proceedings for failing to object to inaccurate jury instructions that prejudice the defendant.  *See Everett v. Beard*, 290 F.3d 500 (3d Cir. 2002) (counsel ineffective for failing to object to a jury charge not requiring the Commonwealth to prove accomplice's intent to kill to convict of first-degree murder); *Combs v. Coyle,* 205 F.3d 269, 286 (6th Cir. 2000) ("Several other of our sister circuits have granted habeas petitions on the grounds that counsel was ineffective for failing to object to

29

or to propose jury instructions. *See, e.g., Burns v. Gammon,* 260 F.3d 892, 897 (8th Cir. 2001) (granting habeas on ineffective assistance grounds due to counsel's failure to object and thus to prompt a  curative cautionary jury instruction); *Freeman v. Class,* 95 F.3d 639, 642 (8th Cir. 1996) (granting habeas on ineffective assistance grounds due to counsel's failure to request cautionary instructions on accomplice testimony); *United States v. Span*, 75 F.3d 1383, 1389-90 (9th Cir. 1996) (finding ineffective assistance because counsel failed to request a significant jury instruction); *Harris v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding ineffective assistance due, inter alia, to "failure to propose, or except to, jury instructions"); *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir.1993) (finding ineffectiveness because counsel failed to object to erroneous jury instructions).").

## 2.    Prejudice

*Strickland* prejudice is present whenever "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "The adjective is important."  *Kyles v. Whitley* , 514 U.S. 419, 434 (1995),[10] "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

---

[10]Although *Kyles* addresses a *Brady v. Maryland* violation, *Brady* materiality is co-extensive with *Strickland* prejudice. *Marshall v. Hendricks*, 307 F.3d 36, 53 (3d Cir. 2002).

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.; see also Strickland*, 466 U.S. at 693.

Because a "reasonable probability" is one "sufficient to undermine confidence in the outcome." *id.*, the *Strickland* prejudice standard is not "stringent" – it is, in fact, "less demanding than the preponderance standard." *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001) (*quoting Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (*Strickland* "specifically rejected the proposition that the defendant had to prove it more likely than not that the outcome would have been altered."); *Williams v. Beard*, 637 F.3d 195, 227 (3d Cir. 2011).

Petitioner establishes prejudice. The scene of these shootings was crowded and confusing. Indeed, Taylor was present at the location to conduct "crowd and traffic" control. Defense counsel attempted to capitalize on the confused scene by highlighting in his witness examinations and closing argument, the various inconsistencies and unlikely aspects of the witness' identification testimony. Added to this is the fact that the jury at Petitioner's first trial was unable to come to a verdict even though the same identification witness testified. And, most significantly, the trial judge believed that the identification was sufficiently suspect to provide the *Kloiber* instruction.

31

The court's mandatory "language of command" – that if the jury found that the witness was sure of his identification than it could not receive the testimony with caution but was required to treat the identification as a "statement of fact"– created an unconstitutional presumption. There was a reasonable probability of a different outcome had there been a defense objection to the instruction.

### C.  Petitioner Presented Part of this Claim to the State Courts and as to the Unpresented Aspects, they are Procedurally Defaulted, However, Petitioner Shows Cause to Overcome the Default

Initial PCRA counsel Gelman challenged the instruction on three fronts: (1) not telling jurors that if they found a factor impinging upon the identification's accuracy then it "must be received with caution," thereby omitting language from *Kloiber*, *PCRA Petition* at 25; A-61; (2) placing a burden on the defendant to prove such factors, *id.* at 30-31; A-64-A-65; and (3) telling jurors that if they found no such factors then the identification "may be treated as a statement of fact," language from *Kloiber* which Gelman argued does not belong in a jury instruction because it creates an improper presumption, *id.*, 26-30, A-61-A-65.

In the District Court Petitioner raised Gelman's first argument and a considerably stronger version of the third. Petitioner adds to PCRA counsel's claim that "lighting and/or conditions" was not the only factor the trial court should have

listed: "qualifications, hedging, or **inconsistencies** in the rest of his testimony," "bad position," and "other reasons" also applied. Pa. Sugg. Std. Crim. Jury Instr. § 4.07B; *see also* note 8, *supra.* And, of course, Petitioner has added a claim based on the language creating the improper mandatory presumption. Trial counsel was ineffective for failing to make all of these objections.

The Court of Common Pleas addressed only the truncated third argument offered by Gelman, *i.e.* whether the "statement of fact" language in a jury instruction was proper. The state trial court ruled that the "statement of fact" language had been upheld by Pennsylvania appellate courts, thus denying the claim. *TCO*, 11-12 (*citing Commonwealth v. Trivigno*, 750 A.2d 243, 253 (Pa. 2000)). The Superior Court endorsed the Court of Common Pleas' reasoning. *Bey-2*, 7, A-75. Neither Court addressed the first prong of Gelman's presentation. And, because Gelman did not raise the enhanced version of the third argument as presented to the District Court, there is no state court ruling on the enhanced aspects of that claim, *i.e.*, the improper mandatory presumption imposed by the court's charge.

Before *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), this Court would have to parse which aspects of the claim that was before the District Court was fairly presented to the state courts. This sometimes difficult task, however, is not necessary post-*Martinez*. That is because even if a portion of the claim presented to the District

33

Court was not presented to the state courts, and is therefore procedurally defaulted,[11] initial PCRA counsel's failure to litigate the claim was itself ineffective, thus establishing cause for the default under *Martinez*.

The Supreme Court has not "given the term 'cause' [to excuse procedural default] precise content," *Reed v. Ross*, 468 U.S. 1, 13 (1984), or created "a comprehensive catalog of the circumstances that would justify a finding of cause," *Smith v. Murray*, 477 U.S. 527, 534 (1986). Instead, cause is established when "a prisoner is impeded or obstructed in complying with a state's procedures." *Martinez*, 132 S. Ct. at 1318.

While a prisoner "must bear the risk of attorney error" not amounting to constitutional error when the attorney acted as the petitioner's "agent . . . in furtherance of the litigation," *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), *Martinez* altered this "unqualified statement in *Coleman* . . . that an attorney's ignorance or inadvertence in a post-conviction proceeding does not qualify as cause to excuse a procedural default." *Id*. at 1315.[12]

---

[11]Petitioner acknowledges that because there are no longer any available state court remedies for the presentation of those aspects of this claim that were not presented to the state courts, that such aspects are in fact procedurally defaulted.

[12]The required "cause" to overcome a procedural default in the habeas corpus context "reflect[s] an equitable judgment that only where a prisoner is impeded or obstructed in complying with the State's established procedures will a federal habeas

*Martinez* established the following exception to *Coleman's* blanket rule: "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial . . . To overcome the default, a prisoner must also demonstrate that the underlying ineffective assistance of trial counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* at 1315, 1318.

The Supreme Court explained the important reasons for permitting a petitioner to have an otherwise procedurally defaulted claim of trial counsel ineffectiveness heard:

> Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors (or the absence of an attorney) caused a procedural default in an initial-review collateral proceeding acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim.

---

court excuse the prisoner from the usual sanction of [procedural] default." *Martinez*, 132 S.Ct. at 1318; *id.*, at 1324 (cause exists when a factor, external to the prisoner, impedes compliance with a state procedural rule: "this external-factor requirement reflects the judgment that States should not be forced to undergo federal habeas review of a defaulted claim unless a factor not attributable to the prisoner obstructed his compliance with state procedures."); *see also*, *Cristin v. Brennan*, 281 F3d 404, 412 (3d Cir. 2002) ("To show cause and prejudice, 'a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements,'" *quoting Coleman*, at 501 U.S. at 753).

*Id.*

To the extent that this Court would find any portion of the claim related to trial counsel's ineffective failure to challenge the *Kloiber* instruction to be defaulted, because such portion was not presented in Petitioner's initial state post-conviction proceedings, Petitioner submits that his initial post-conviction attorney ineffectively failed to present those aspects of the claim.

The *Martinez* rubric applies only to "substantial claims" of trial counsel ineffectiveness. A claim of trial counsel ineffectiveness is deemed "substantial" under *Martinez*, if it meets the federal habeas corpus standard governing the issuance of a certificate of appealability (COA), which is required in order to appeal the denial of a habeas petition. *Martinez*, 132 S.Ct. at 1318-1319 ("To overcome the default, a prisoner must also demonstrate that the underlying ineffective assistance of trial counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Cf. Miller–El v. Cockrell,* 537 U.S. 322 . . . (2003) (describing standards for certificates of appealability to issue).")). *Miller-El,* summarized the standard for issuance of a COA:

> A petitioner must show that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.

36

> [A] COA does **not** require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. . . a COA will issue in some instances where there is no certainty of ultimate relief.

*Id.* at 336-337.  In making this determination, Courts of Appeals need only conduct a "threshold inquiry into the underlying merit" of the petitioner's claim.  *Id.*

Application of this *COA* standard to Petitioner's claims of trial counsel ineffectiveness that was possibly defaulted with respect to the identification instruction,  shows that these claim is  "substantial" within the meaning of *Martinez*, and is worthy of review.  Indeed, this Court has granted COA on this claim, thus demonstrating that the claim is "significant" and therefore the default, if any, is overcome.

### D.    AEDPA Deference

ADEPA deference under 28 U.S.C. § 2254(d)(1) should not be afforded to the state courts' resolution of the partial claim presented in initial PCRA proceedings. The state courts only addressed the portion of Gelman's claim related to the of the instruction indicating that the witness' identification should be treated as a "statement of fact."  Standing alone, the state court ruled that this portion of the instruction was proper as a matter of state law, and therefore trial counsel was not ineffective for failing to object to it.  However, when that portion is combined with the other errors

identified herein, the state court's ruling takes on another light.

When combined with the failure to instruct the jury to consider receiving the identification testimony with caution, the failure to list other factors that invokes the *Kloiber*-derived caution, and of course, the mandatory presumption, the state court's ruling on the narrow issue before it, is not worthy of deference.

As to those portions of the claim that were not presented to the state courts, and which are now defaulted, for which Petitioner shows cause to overcome the default, this Court's review is *de novo*. *Bronshtein v. Horn*, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005) (*de novo* review applied to claim for which there was not state court review because of the application of an inadequate state procedural ground "We do not apply the deferential standards of review set out in 28 U.S.C. § 2254(d) because this claim was not "adjudicated on the merits" by the state supreme court.")

## II.    THE *DOYLE* ERROR AND RELATED CLAIMS OF TRIAL COUNSEL AND INITIAL POST-CONVICTION COUNSEL INEFFECTIVENESS

To protect the Fifth Amendment privilege against self-incrimination, arrestees are told, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), that they have the right to decline to speak with anyone about the alleged offense. Due process prevents a prosecutor from attempting to discredit exculpatory evidence produced at trial by commenting on the defendant's failure to provide such evidence post-arrest, and after the administration of *Miranda* warning of the right to remain silent.   *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976):  "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial"). This Court has recently reiterated the *Doyle* rule:

> As established by *Doyle v. Ohio*, the right to remain silent contains an implicit promise that a defendant's post-Miranda silence will not carry adverse consequences. This promise prohibits a prosecutor from impeaching a defendant with his or her post-Miranda silence. Otherwise, a prosecutor could diminish a defendant's credibility by suggesting that a defendant's silence raises suspicion, thereby burdening the defendant's right to remain silent with a costly, unconstitutional penalty.

*United States v. Lopez*, No. 14 4610, 2015 WL 10692810, at *1 (3d Cir. April 20, 2016).

Thus, a *Doyle* due process violation occurs when the prosecutor refers to the

defendant's silence at any point after the defendant has been arrested and warned of the right to remain silent. *Lopez*, *id.*; *Virgin Islands v. Davis*, 561 F.3d 159, 164-65 (3d Cir. 2009); *Hassine v. Zimmerman*, 160 F.3d 941, 948 (3d Cir. 1998) (prosecutor's cross-examination questions about why the defendant had kept exculpatory evidence to himself during the seven months he spent in jail before trial was a due process violation and an "attempt[] to elicit the precise inferences that the State is prohibited from exploiting under *Doyle*.").

In *Lopez*, this Court found a *Doyle* violation based upon the same type of argument as made against Petitioner. There, the prosecutor argued that Petitioner's claim that he had been framed by the police was not worthy of belief, because "he did not tell anyone that he had been framed by the police before trial." *Lopez*, 2015 WL 10692810 at *2; *id.*, *4 ("As in *Doyle,* Lopez remained silent after his arrest, waiting until trial to proclaim that he was framed for possessing the gun. When the Government cross-examined him, the prosecutor challenged Lopez's defense by repeatedly asking whether he told anyone that he had been framed at an earlier time.")

In *Davis*, the Court held it error for the prosecutor to impeach exculpatory evidence of a different shooter by arguing that the defendant had not mentioned it to

law enforcement in the months before trial.[13] 561 F.3d at 165.  Specifically, the Court

held that it violated due process for the prosecutor to state during summation:

> I asked Mr. Davis between January and April, now, have you ever
> supplied the police with any information concerning where Goofy [the
> alleged shooter] can be found so the police can arrest him? Where Goofy
> can be located? Have you ever given? No, no, no. Can you believe that?
> . . . [I]f the truth was really the truth there was a guy named Goofy and
> somebody else fired the shots, would you not use everything within your
> power if it was the truth to notify the police to at least give them a
> statement that would exonerate yourself. No he didn't do it.

561 F.3d at 162.

Here, the prosecutor's two sets of comments on Petitioner's ostensible failure

to provide an exculpatory version of the events violated *Doyle*, it progeny and the

Due Process Clause of the Fourteenth Amendment.

The prosecutor argued that Thompkins' statements to prior defense counsel –

which described the shooter and specifically denied that it was Petitioner – were

untrue because Petitioner did not produce the statements until just before trial. The

prosecutor began:

---

[13]*Davis* reversed the defendant's conviction and ordered a new trial, conducting
a harmless error analysis and concluding that the evidence against that petitioner was
not "overwhelming" where the physical evidence did not specify the shooter and "the
Government's case against Davis depended largely upon the credibility of its three
eyewitnesses." 561 F.3d at 166.

> [Thompkins] goes to Mr. McMonagle's office and he gives this statement to Mr. McMonagle back in 2002, a statement which, if it is to be believed, if it is to be believed, this is an innocent man, a statement saying that he's an innocent man, and I don't get this until Friday last week.

NT 12/14/05, 231-232; A-999-A-1000.

After defense counsel objected and the court sustained the objection, ruling, "I told the jury it is their own recollection,"[14] *id.* at 232-233; A-1000-A-1001, the prosecutor continued:

> Fine. There is no obligation to give it to me. Fine. Okay. There isn't. There isn't. Okay. But if this is the truth, if this is to be believed, if that's an innocent man, why wouldn't you give it to law enforcement or the prosecutor who has the power to reinvestigate a case where there might be a mistake? You don't think that happens. It happens. Who brought the charges? Who has the power to drop the charges and withdraw the prosecution? I do. Me. My office. Why wouldn't you want to tell me about this so we could reinvestigate it? Why wouldn't you?

*id.* at 233-234; A-1001-A-1002.

These comments are materiality indistinguishable from the comments condemned in *Doyle*, *Lopez*, *Davis* and *Hassine*. All seek to impeach an exculpatory version of the events because the defendant did not alert law enforcement or others

---

[14]The apparent reason for this quizzical ruling is that the court and the prosecutor mistakenly believed that whether the prosecutor could comment on Petitioner's pre-trial silence was governed by whether Thompkins' statement to Mr. Monagle contained a disclaimer saying that Mr. McMonagle would provide the statement to law enforcement. Thus, the court explained to jurors that if they recalled this disclaimer as being in the statement, then the prosecutor could validly comment on Petitioner's silence.

to the exculpatory information that was presented at trial. In one respect, the comments at Petitioner's trial were even more inappropriate because the prosecutor's use of the phrase "if that's an innocent man" suggested to jurors that Petitioner needed to affirmatively speak up to law enforcement to prove that he was innocent. This argument also violated Petitioner's presumption of innocence, "th[e] bedrock 'axiomatic and elementary' principle 'whose enforcement lies at the foundation of the administration of our criminal law.'" *In re Winship*, 397 U.S. 358, 363 (1970) (*citing Coffin v. United States*, 156 U.S. 432 (1895)). Moreover, whereas the prosecutor in *Davis* referred to the defendant's ability to exonerate *himself*, in Petitioner's case the prosecutor's statement, "Who has the power . . .? I do. Me. My office," presented himself as the arbiter of guilt or innocence, improperly bolstering his own case. *See e.g. Commonwealth v. Randall*, 758 A.2d 669, 676 (Pa. Super. 2000) ([I]mproper bolstering or vouching for witnesses by the Commonwealth occurs in two situations: (1) When the prosecution places the prestige of the government behind the witness by personal assurances of the witness's veracity; and (2) when the prosecution indicates that information which is not before the jury supports the witness' testimony.") Finally, the prosecutor used Petitioner's silence to suggest not only that Thompkins statement were untrue but that Petitioner and his counsel knew they were untrue and were willing to present false evidence. *Id.* at 236.14-16 ("That's the truth?

43

They don't even believe it's the truth because they don't even give it.").

Trial counsel objected to this argument on the ground that the rules of discovery did not require such disclosure. This was a valid basis upon which to object, as due process cannot tolerate the prosecution's argument that the defendant is guilty because he exercised his rights under the discovery rules to not disclose the statements. However, trial counsel ineffectively failed to object to this portion of the argument on Due Process and/or *Doyle* grounds. Similarly, direct appeal and initial PCRA counsel ineffectively failed to raise this error at all.

In a third comment made during closing argument, the prosecutor stated the following rhetorical questions:

> Now, that's something the jury is going to want to know, why did you run from the police, Saleem? Why did you make them chase you? Why were you ducked down and crouched behind cars? Why were you hiding? Why were you trying to conceal yourself? Why?

NT 12/14/05, 206-207; A-974-A-975.

This set of rhetorical questions challenged Petitioner's defense because he offered no explanation for his actions. As phrased, the questions taunted Petitioner for no offering answers by testifying. Thus, these comments violated both *Doyle*, and Petitioner's right to not testify at trial.[15]

---

[15]A criminal defendant has the right to remain silent. U.S. CONST. AMEND 5 & 14; PA. CONST. Art. I, § 9; *Carter v. Kentucky*, 450 U.S. 288, 305 (1981) ("The freedom of a defendant in a criminal trial to remain silent unless he chooses to speak

Application of the *Strickland* standard again shows that trial counsel's failure to raise the proper constitutional objections – that these comments violated *Doyle* and due process of law – shows that trial counsel was again ineffective. There could have been no possible sound reason for objecting on one ground (based on the discovery rules), but not on the stronger constitutional grounds. Similarly, there could be no conceivable reason for not objecting to the third comment, impacting Petitioner's exercise of his right to remain silent. Petitioner repeats the above discussion of prejudice arising from the failure to object to the *Kloiber* instruction. Singularly, or combined, these instances of ineffective counsel caused Petitioner prejudice.

These improper prosecutorial comments were not raised on direct appeal or during initial PCRA proceedings. Thus, they are fully procedurally defaulted. However, again through the application of *Martinez*, Petitioner shows cause to overcome the default of these claims.

---

in the unfettered exercise of his own will is guaranteed by the Fifth Amendment and made applicable to state criminal proceedings through the Fourteenth") (citations and internal quotation marks omitted); *Griffin v. California*, 380 U.S. 609 (1965).

## CONCLUSION

There were two constitutional violations that took place at Petitioner's trial.

The error in the *Kloiber* instructions and the *Doyle* error, each caused Petitioner

prejudice.  This Court may reach the merits of these claims through application of

*Martinez*, by which Petitioner overcomes any default of any aspect of either error.

Once reached, this Court should reverse the order of the District Court, and remand

the case with directions to grant the Writ.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
PO Box 120
Swarthmore, PA 19081
215-450-0903
Wiseman_Law@Comcast.Net

Counsel for Appellant
Saleem Bey

Dated:      May 1, 2016
            Swarthmore, PA

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 1st day of May, 2016 I served a copy of Appellant's Initial Brief and Joint Appendix upon the following person by filing the same with this Court's ECF Filing System:

John Goldsborough
Office of the Philadelphia District Attorney
Counsel for Appellee

/s/ Michael Wiseman

Michael Wiseman

## Certificate of Bar Membership and Good Standing

I, Michael Wiseman, hereby certify that I am a member in good standing of the Bar of this Court.

/s/ Michael Wiseman

Michael Wiseman

Dated:     May 1, 2016

## Certificate of Compliance with FRAP 32(A)(7)(C)

I, Michael Wiseman, hereby certify that this brief consists of approximately 10,880 words, as determined by the word processing system used to prepare the brief.

/s/ Michael Wiseman

Michael Wiseman

Dated:      May 1, 2016

**Certificate of Identical Compliacne of**
**Electronic Brief and Paper Copy of**
**Brief Pursuant to LAR 31.1(c)**

I, Michael Wiseman, hereby certify that the text of the electronic brief filed in this case is identical to the text of the paper copies of the brief.

/s/ Michael Wiseman

Michael Wiseman

Dated:        May 1, 2016

**Certificate of Virus Detection
Program Pursuant to LAR 31.1(c)**

I, Michael Wiseman, hereby certify that on May 1, 2016 the Norton
AntiVirus, virus detection program was run on the file containing
Appellant's E-Brief and that no virus was detected.

/s/ Michael Wiseman

Michael Wiseman

### Index to Appendix

**Volume 1**

Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

District Court Order
and Magistrate's Report and Recommendation . . . . . . . . . . . . . . . . . . . . . . . A-3

District Court Docket Sheets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-21

Order, Court of Appeals
Granting Certificate of Appealability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-25

**Volume 2**

Superior Court Opinion, *Commonwealth v. Bey*
No. 1864 EDA 2006 (Direct Appeal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-27

Post-Conviction Relief Act Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-37

Super Court Opinion, *Commonwealth v. Bey*
No. 771 EDA 2011 (PCRA Appeal) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-68

Diagram of Scene (Commonwealth Trial Exhibit C-1) . . . . . . . . . . . . . . . . . A-76

Transcript of Preliminary Hearing
December 12, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-77

Transcript of Trial, December 9, 2005 (Day 1) . . . . . . . . . . . . . . . . . . . . . . . A-97

**Volume 3**

Statement of Police Officer Daniel Taylor . . . . . . . . . . . . . . . . . . . . . . . . . . A-306

Statement of Police Sergeant Michael Walton . . . . . . . . . . . . . . . . . . . . . . . A-308

Statement of Kenneth Thompkins to Police
November 24, 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-310

Statement of Kenneth Thompkins to Counsel Brian McMonagle
April 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-314

Statement of Kenneth Thompkins to Investigator Diane Cowan
May 7, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-317

Transcript of Trial, December 12, 2005 (Day 2) . . . . . . . . . . . . . . . . . . . . . . A-319

**Volume 4**

Transcript of Trial, December 13, 2005 (Day 3) . . . . . . . . . . . . . . . . . . . . . . A-534

**Volume 5**

Transcript of Trial, December 14, 2005 (Day 4) . . . . . . . . . . . . . . . . . . . . . . A-769

Transcript of Trial, December 15, 2005 (Day 5) . . . . . . . . . . . . . . . . . . . . . . A-1012

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____ :
                               :
Saleem Bey,                    :
                               :         Docket Number
        Petitioner/Appellant,  :          13-cv-5848
                               :
            v.                 :        Hon. Anita B. Brody
                               :    United States District Judge
Louis Folino, et al.,          :
                               :
        Respondents/Appellees. :
_____ :

### NOTICE OF APPEAL

**PLEASE TAKE NOTICE** that Petitioner **SALEEM BEY**, hereby appeals to the United States Court of Appeals for the Third Circuit, from each and every adverse finding and ruling rendered by the District Court in its *Order* of July 8, 2015 (document # 32), adopting the Magistrate's Report and Recommendation, denying and dismissing the Petition for Habeas Corpus with prejudice, and denying a Certificate of Appealability.

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
PO Box 120
Swarthmore, PA 19081
Wiseman_Law@Comcast.Net
215-450-0903
Counsel for Petitioner/Appellant
Saleem Bey

Dated:      August 3, 2015
            Swarthmore, PA

**A-001**

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 3rd day of August, 2015, I served a copy of the foregoing upon the following person by filing the same with this Court's ECF Filing System:

ADA John Goldsborough
Counsel for Respondents/Appellees

/s/ Michael Wiseman

Michael Wiseman

**A-002**

KeyCite Blue Flag – Appeal Notification

**Appeal Filed by**    SALEEM BEY v. SUPERINTENDENT GREENE SCI,
ET AL,    3rd Cir., August 5, 2015

2015 WL 4130358
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Saleem BEY, Petitioner,
v.
Louis FOLINO, et al., Respondents.

Civil Action No. 13–5848.
|
Filed July 9, 2015.

**Attorneys and Law Firms**

Michael Wiseman, Swartmore, PA, for Petitioner.

John W. Goldsborough, District Attorney's Office,
Philadelphia, PA, for Respondents.

### *ORDER*

ANITA B. BRODY, District Judge.

**\*1** AND NOW, this *8th* day of *July,* 2015, upon careful and
independent consideration of the petition for writ of habeas
corpus, and after review of the Report and Recommendation
of the United States Magistrate Judge Timothy R. Rice and
Petitioner's objections to the Report and Recommendation, it
is **ORDERED** that:

1. The Report and Recommendation is **APPROVED** and
**ADOPTED.** [1]

2. The petition for writ of habeas corpus is **DENIED** and
**DISMISSED.**

3. There is no basis for the issuance of a certificate of
appealability.

### *REPORT & RECOMMENDATION*

TIMOTHY R. RICE, United States Magistrate Judge.

Petitioner Saleem Bey, a prisoner at the State Correctional
Institution at Greene, has filed a petition for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254. For the following
reasons, I recommend Bey's claims be denied with prejudice
as meritless and procedurally defaulted.

### *FACTUAL AND PROCEDURAL HISTORY*

On December 15, 2005, Bey was convicted of first-degree
murder, attempted murder, and possession of the instrument
of a crime. Crim. Docket, CP–51–CR–1206691–2001, at 10–
12. This was his second trial on these charges because the first
had resulted in a hung jury a year earlier, on December 13,
2004. Crim. Docket at 7; *see also* Exhibit A. In 2005, Bey was
represented by different counsel and the attempted murder
victim, Kevin Thompkins, who had not testified at his original
trial, testified. *Compare* N.T. 12/3/04 at 1, *with* N.T. 12/5/05
at 1; N.T. 12/13/05 at 53, et seq. The other witnesses and
evidence presented by the prosecution were nearly identical.

Two police officers, Officer Taylor and Sergeant Walton,
testified they were working a traffic detail at 3:30 a.m. on
November 24, 2001, responsible for directing the flow of
crowds leaving two after-hours clubs at the corner of Spring
Garden and 6th Streets, when a series of shots left one man
dead and another critically injured in an alley used by club
patrons for parking. N.T. 12/5–12/7/05 (jury selection); N.T.
12/9/05 at 48–209 (Officer Taylor); N.T. 12/12/05 at 106–
66 (Sergeant Walton). Officer Taylor testified he saw Bey
shoot one of the victims with a large silver handgun and
immediately alerted other officers that the shooter was armed
and dressed in a gray sweat suit. N.T. 12/9/05 at 73–74,
86. Sergeant Walton testified that he heard the shots and
then saw Bey, dressed in a gray sweat suit, running from
police. N.T. 12/12/06 at 114–15, 119. Another officer, Officer
Ferrero, testified that he also heard the shots, and that he
and his partner helped apprehend Bey moments afterwards,
upon hearing Officer Taylor identify Bey by his distinctive
clothing. N.T. 12/12/06 at 15, 17. Officer Ferrero further
testified he saw Bey discard a small Derringer handgun at the
crime scene. *Id.* at 24. Other police witnesses testified about
the balance of the police investigation and forensics, which
included identifying a large silver handgun as the murder
weapon. *See, generally, id.,* N.T. 12/13/05, and N.T. 12/14/05
at 5–24. The silver gun had been recovered under a car Bey

had hidden behind while trying to evade Officers Taylor and Ferrero. N.T. 12/13/05 at 223.

**\*2** Thompkins, the surviving victim, testified reluctantly, and claimed he had been shot from behind and had no idea who shot him. N.T. 12/13/05 at 56, 72. The prosecutor questioned him about his prior written statements to Bey's former counsel that stated he saw the shooter, and it was not Bey. *Id.* at 60–71. Thompkins claimed he had fabricated those statements in an effort to get Bey's former counsel to share information regarding the pending investigation with him. *Id.* at 72. The prosecutor suggested that Thompkin's real reason for providing the false information was fear of retribution. *Id.* at 77. Bey called two character witnesses. N.T. 12/14/05 at 45–71. Although its requests to review two portions of Officer Taylor's testimony were effectively declined, the jury found Bey guilty of all three charges after approximately four hours of deliberations. N.T. 12/15/05 at 29–40.

On May 31, 2006, Bey was sentenced to life in prison. Crim. Docket at 15. He changed counsel for post-trial motions and appeal, Crim. Docket at 17, the Superior Court affirmed his judgment of sentence on May 12, 2008, 1864 EDA 2006, and the Pennsylvania Supreme Court denied review on November 20, 2008, 298 EAL 2008. On October 13, 2009, Bey filed a petition for relief under Pennsylvania's Post Conviction Relief Act, 42 Pa.C.S. § 9541 et seq. ("PCRA"), which was dismissed on March 11, 2011. Crim. Docket at 21–22. The Superior Court affirmed on June 1, 2012, *id.* at 23, and the Pennsylvania Supreme Court declined review on June 5, 2013, *id.* at 24. On October 3, 2013, Bey filed a timely habeas petition, alleging ten claims of ineffective assistance of counsel. *See* Habeas Pet. (doc. 1) at 1; Habeas Br. (attached to Habeas Pet.) at ii–vi.

### DISCUSSION

Before seeking federal habeas relief, a petitioner must exhaust all available state court remedies, "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese,* 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citations omitted); *see also* § 2254(b)(1). The petitioner must "fairly present his claim in each appropriate state court ... alerting that court to the federal nature of the claim ." *Baldwin,* 541 U.S. at 29 (quotation and citation omitted). If a petitioner has failed to exhaust his state court remedies and the state court would now refuse to review the claim for some procedural reason, the

claim may be denied as procedurally defaulted. *See Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A habeas claim also may be procedurally defaulted if the petitioner presented it to the state court, but the state court refused to address it on its merits based on "a state-law ground that 'is independent of the federal question and adequate to support the judgment.' " *Cone v. Bell,* 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) (citations omitted).

A procedurally defaulted claim may be considered only if a petitioner demonstrates: (1) a legitimate cause for the default and actual prejudice from the alleged constitutional violation; or (2) a fundamental miscarriage of justice from a failure to review the claim. *Coleman,* 501 U.S. at 750. To establish a fundamental miscarriage of justice, a petitioner must present "new reliable evidence" of his actual innocence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup v. Delo,* 513 U.S. 298, 321–24, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).

**\*3** In *Martinez v. Ryan,* ––– U.S. ––––, ––––, 132 S.Ct. 1309, 1320, 182 L.Ed.2d 272 (2012), the Supreme Court outlined a narrow equitable exception to procedural default for prisoners whose Sixth Amendment ineffective assistance of counsel claims were required, under state law, to be addressed in collateral review procedures. Under *Martinez,* these petitioners can establish "good cause" to excuse a procedural default if: (1) "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective;" and (2) the claim is "a substantial one," meaning it has "some merit." *Martinez,* 132 S.Ct. at 1318.

If a state court has decided a claim, its decision merits substantial deference. *See* § 2254(d); *Cullen v. Pinholster,* ––– U.S. ––––, ––––, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) ("difficult to meet and highly deferential standard ... which demands that state-court decisions be given the benefit of the doubt."). I cannot grant a writ of habeas corpus unless I find the state court's adjudication of a claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *see Showers v. Beard,* 635 F.3d 625, 628 (3d Cir.2011).

I must presume the state court's findings of fact are correct, and Bey may rebut that presumption only with clear and convincing evidence. *See* § 2254(e)(1). A state court ruling is "contrary to" clearly established Supreme Court law for the purposes of § 2254(d)(1) if it: " '(1) contradicts the governing law set forth in the [Supreme] Court's cases or (2) confronts a set of facts that are materially indistinguishable from [those in] a decision of [the Supreme Court] and [the state court] nevertheless arrives at a [different] result.' " *Branch v. Sweeney,* 758 F.3d 226, 233 (3d Cir.2014) (quoting *Outten v. Kearney,* 464 F.3d 401, 413 (3d Cir.2006)); *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

A state court decision constitutes an "unreasonable application" of Supreme Court law if it identifies the correct governing legal rule from Supreme Court decisions, but "unreasonably applies it to the facts of the particular state prisoner's case." *Williams,* 529 U.S. at 407–08. When making the "unreasonable application" inquiry, I must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. I may not grant habeas relief "merely because [I] conclude that the state court applied federal law erroneously or incorrectly." *Jacobs v. Horn,* 395 F.3d 92, 100 (3d Cir.2005). Rather, I must determine whether the state court's "determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); *see also Cavazos v. Smith,* ––– U.S. ––––, ––––, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (habeas court "may not overturn a state court decision ... simply because the federal court disagrees with [it]").

**\*4** Clearly established federal law governing ineffectiveness claims is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Premo v. Moore,* 562 U.S. 115, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011). The defendant must show (1) counsel's performance was deficient, *i.e.,* counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced him, meaning that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687, 694. Pennsylvania applies the same test. *See Werts v. Vaughn,* 228 F.3d 178, 203 (3d Cir.2000); *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1075–76 (Pa.2006).

Counsel's ineffectiveness is measured objectively, considering all the circumstances. *See Strickland,* 466 U.S. at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. In evaluating counsel's performance, I must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy. *Id.* at 689. A strategic choice "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." *Id.* at 690–91. The relevant inquiry is not whether Bey's counsel was prudent, appropriate, or perfect. *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Rather, the focus is simply to ensure the proceedings resulting in Blount's conviction and sentence were fair. *See Strickland,* 466 U.S. at 684–85.

Review of ineffectiveness claims is "doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry,* 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). Accordingly, if the state court addressed counsel's effectiveness, and applied the correct legal standard, a petitioner must show the state court's decision was objectively unreasonable. *Woodford v. Visciotti,* 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). "[I]t is not enough to convince a federal habeas court that, in its independent judgment," the state court erred in applying *Strickland. Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Bey, therefore, "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in [federal court in] the first instance[.]" *Id.* at 698–99.

Bey alleges ten ineffectiveness of counsel claims.

## I. *Extraneous Violence*

Bey argues his counsel's ineffectiveness in limiting references to extraneous violence and other crimes so undermined his trial that it amounted to a denial of due process. Habeas Br. at 7. The information he contends was wrongfully put before the jury consists of both testimony and argument, and allegedly resulted from a combination of prosecutorial misconduct and court error, compounded by ineffective assistance of counsel. Habeas Br. at 5. The "bulk" of this claim, he concedes, was addressed by the state courts, but he claims the remainder should be excused from procedural default under *Martinez* due to appellate and PCRA counsel's ineffectiveness that permitted PCRA's one-year statute of limitations to lapse without their inclusion. *Id.* at 7.

*5 The Commonwealth contends all claims are defaulted except a single evidentiary ruling by the trial court, which was upheld by the Superior Court. Cmwlth. Br. (doc. 11) at 21 n. 9. It contends Bey's failure to bring most of the claims before the state courts cannot be excused because he had thorough, competent representation during the PCRA proceedings who made a reasonable decision not to argue each of the many points now raised before the federal courts. *Id.* at 70–80. Even in combination, it maintains, Bey's arguments are meritless. *Id.*

It appears that, with the exception of the trial court's evidentiary ruling as it applied to Detective Mosley's testimony, the 'bulk' of Bey's first claim is defaulted, since it was not "fairly presented" to the state courts. *Baldwin v. Reese,* 541 U.S. 27, 33, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004). Bey argues that this default should be excused because it was caused by the ineffectiveness of his PCRA counsel, who failed to present this "substantial" claim, and he can demonstrate prejudice by walking through the deficiencies in the evidence presented against him. Habeas Br. at 28–44. Bey argues that the Superior Court was wrong, as a matter of state law, on the evidentiary ruling it did make, and that its description of the evidence against Bey as "overwhelming" is an "unreasonable determination of the facts" in this case. Habeas Br. at 7.

I need not address whether Bey has demonstrated adequate cause and prejudice to excuse the default of the 'bulk' of this claim, however, because even this enhanced version of the claim fails when assessed on its merits. § 2254(b)(2).

A. *Extraneous Violence Testimony*

1. *Thompkins' Testimony*

The prosecution presented evidence about other violence and murders to explain the testimony of Thompkins. N.T. 12/13/05 at 45–52. Thompkins offered two different versions of the shooting: first, at the scene, in the early morning hours of November 24, 2001. N.T. 12/12/05 at 87–88. When speaking with Officer Bevidas, and in an effort to maintain consciousness despite his extensive bleeding, he claimed he had not seen who shot him. *Id.* Later that day, when interviewed by detectives at the hospital where he was being treated for his four gunshot wounds, Thompkins maintained that he had not seen the shooter. N.T. 12/13/05 at 145. Approximately five months later, on April 14, 2002, Thompkins was interviewed by Bey's former lawyer, and claimed that he had seen the shooter, and it was not Bey. *Id.*

at 64–65. Thompkins signed a statement to that effect, and confirmed it in another signed statement to the same lawyer's investigator on May 7, 2004. *Id.* at 62, 69–70.

Despite repeated police attempts to contact him and the issuance of a bench warrant, Thompkins did not appear at Bey's first trial in December 2004, and his statements to Bey's lawyer were not referenced. N.T. 12/13/05 at 147–49; *see, generally,* N.T. 12/3–12/8/04. In January 2005, Thompkins was arrested pursuant to the outstanding bench warrant. *Id.* at 149–50. After arresting him, the prosecutor and a detective walked Thompkins through the lot where the shooting took place and asked him questions. *Id.* at 152. The detective testified that, during this meeting, Thompkins effectively admitted that he did not want to testify for the Commonwealth because he feared that cooperation with the prosecutor's office would expose him to retaliation. *Id.* at 151. Thompkins maintained, however, that he had not seen who shot him. *Id.* at 71.

*6 On Thursday, December 8, 2005 (the day before Bey's 2005 trial began), Bey's counsel first provided the prosecutor's office copies of Thompkins' 2002 and 2004 statements to Bey's former counsel. *Id.* at 154. Thompkins was immediately summoned to meet with the prosecutor and two detectives again, and he told them he had fabricated the information in the statements to Bey's previous attorney. *Id.* at 77. According to the detectives, he also admitted that the real reason he had done so was fear of retribution. *Id.* at 181. Thompkins signed a statement disclaiming his 2002 and 2004 statements, explaining that he had made them to protect himself and his family. N.T. 12/13/05 at 77.

Bey appears to make two different arguments as to measures his counsel should have taken to prevent Thompkins' damaging testimony, although he intertwines them in his memorandum. First, he appears to argue that his counsel should have moved to exclude Thompkins as a witness, reasoning that because Thompkins did not see who shot him, all of his testimony was inadmissible. Habeas Br. at 7. He states the prosecutor's use for Thompkins' testimony was a pretext to admit the "mountain of evidence" related to the six unrelated crimes and support the prosecutor's unproven theory that the shooting was "a South Philly thing." Habeas Br. at 5–6.

I disagree. Evaluated from the perspective of December 7, 2005, the day before the prosecution learned of Thompkins' 2002 and 2004 statements to Bey's prior counsel, Thompkins'

testimony was relevant to establish six facts that supported the prosecution's theory: (1) Thompkins and Swanson, the other shooting victim, were friends who had spent the evening together; (2) Thompkins could not credibly explain why he and Swanson were carrying thousands of dollars in cash; (3) Thompkins and Bey knew one another; (4) Thompkins was from South Philadelphia; (5) Swanson was from South Philadelphia; and (6) Bey was from South Philadelphia. [1] N.T. 12/13/05 at 67, 86. Especially in combination with the two other pieces of evidence the prosecution was able to introduce through other means—(1) that the gun itself was from South Philadelphia, and (2) that Swanson had previously been shot—Thompkins' testimony was relevant to, and supportive of, the prosecution's theory regardless whether he had made any prior inconsistent statements about the shooting. Thus, Bey's contention that "Thompkins' testimony was not probative of who shot him and Terry Swanson" is incorrect. Habeas Br. at 7. Since counsel cannot be ineffective for failing to pursue a meritless claim, any failure to pursue the full exclusion of Thompkins' testimony does not constitute ineffective assistance of counsel. *United States v. Sanders, 165 F.3d 248, 253 (3d Cir.1999).*

Bey's second argument appears to be that counsel was ineffective in litigating the motion in limine to limit Thompkins' testimony. Habeas Br. at 9–10. Once the prosecution learned, the day before Bey's 2005 trial began, that Thompkins had made statements in 2002 and 2004 exculpating Bey and that they were going to be used at trial, the prosecution was permitted, according to the Superior Court, to introduce evidence of Thompkins' then-existing state of mind to explain why he had made the inconsistent statements. Super Ct. PCRA Op. at 5. Bey's trial counsel claimed possible prejudice against Bey if this testimony went too far. N.T. 12/13/05 at 48. During Thompkins' testimony, the trial judge instructed the jury that it should assess Thompkins' credibility based on his "demeanor," and further instructed that "only certain evidence can come in about his state of mind and that's the only purpose of this examination right now." *Id.* at 81. The state law evidentiary ruling, which was upheld by the Superior Court, is not reviewable here. *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (issues of state law are not reviewable under federal habeas statute). Since counsel cannot be ineffective for failing to pursue a meritless claim, any failure by trial counsel to further challenge this ruling cannot constitute ineffective assistance of counsel. *Sanders, 165 F.3d at 253.*

## 2. *Detective Boyle's Testimony*

**\*7** Testifying after Thompkins was Detective Charles Boyle, who had taken Thompkins' original statement in the hospital on November 24, 2001. N.T. 12/13/05 at 140. Boyle described the extensive efforts he made to locate Thompkins before the 2004 and 2005 trials, including executing the bench warrant. *Id.* at 147–49. He then testified that Thompkins had told him he did not attend the December 2004 trial because the detective was unable to "protect" him or his family. *Id.* at 151. On cross-examination, Bey's attorney asked whether Thompkins' interview had established a motive for the shooting. *Id.* at 158–59. Boyle admitted it had not, but added "Mr. Thompkins didn't directly come out and tell us there was a motive, but Detective Mangold and myself knew the motive." *Id.* at 159. Bey's attorney rephrased his questions, and Detective Boyle admitted again that his interrogation of Thompkins had revealed no motive for his shooting or Swanson's. *Id.* He later admitted that he had decided not to further pursue contempt charges against Thompkins for failing to testify at the 2004 trial. *Id.* at 167–69.

The prosecutor sought to question Boyle about a special homicide unit investigating a "series of murders" in South Philadelphia, and Bey's lawyer objected to the line of questioning. *Id.* at 170–71. The prosecutor argued that Bey's lawyer had "open[ed] the door" to the testimony by creating the "false impression" that the prosecution had no theory of motive. *Id.* at 170–72. The judge ruled that, because the prosecution had no evidence to tie the defendant to the "series of murders" theory, Boyle would not be allowed to testify about it. *Id.* at 173. Finally, the trial judge sustained Bey's lawyer's objection to the prosecutor's leading question that, although Thompkins' statement provided no information about a motivation, that did not mean there was none. *Id.* at 174.

Detective Boyle was likely able to convey to the jury that he thought he knew of a reason for Bey to shoot Thompkins, but his testimony also made it clear that the prosecution had insufficient evidence to support his theory. *See, generally, id.* at 140–74. Between Bey's lawyer's objections and the trial judge's rulings, Boyle was prohibited from testifying about his speculations. *Id.* Bey's argument that Boyle suggested to the jury that he knew of a "secret motive" mis-states the trial record. Habeas Br. at 13.

Bey's trial attorney's failure to further object to Detective Boyle's testimony regarding Thompkins' fear did not constitute ineffective assistance because that information had

already been ruled admissible to explain Thompkins' state of mind and failure to pursue a meritless claim cannot constitute ineffective assistance. *Sanders,* 165 F.3d at 253.

### 3. *Detective Mosley's Testimony*

Failure to object to Detective Mosley's testimony regarding the six unrelated murders is the one piece of this claim that was exhausted before the state courts. In his PCRA petition, Bey argued his counsel was ineffective for allowing Detective Mosley's testimony to proceed without objection. 7/26/11 PCRA Ct. Op., 771 EDA 2011 at 4 (citing PCRA petition at 13), attached as Exhibit B to Habeas Br. The PCRA court agreed that the evidence was improperly admitted, but found no prejudice because other evidence of guilt was "overwhelming." *Id.* at 8. On appeal, the Superior Court disagreed, finding the testimony was admitted properly and any error would have been harmless because of the overwhelming evidence against Bey and a disclaimer given by the prosecutor during closing arguments. 6/1/2012 Super. Ct. PCRA Op., 771 EDA 2011, at 5–7, attached to Habeas Br. as Exhibit A of Exhibit C.

**\*8** Detective Mosley, who testified after Detective Boyle, stated that, during their December 8, 2005 meeting, Thompkins had told her, her partner, and the prosecutor that he had made the 2002 and 2004 statements to Bey's previous attorney because "he didn't want to get shot again. He had family living in South Philly and he knew that if he—if he said anything other than what he said, something could happen to him." *Id.* at 181. She testified that he had explained his fears, saying "he had a brother that was killed, two brothers that were killed, and a friend, Terry Swanson, who was killed, and Terry Swanson's twin brother was killed and two of his cousins—two of Terry's cousins were murdered." *Id.* at 182. She testified he said "he just did not want to get involved" even though he was aware of and had told her about all these prior killings. *Id.* at 183. She also explained there were things Thompkins was willing to tell her that he did not want "put down on paper." *Id.*

The Pennsylvania Superior Court ruled Mosley's testimony admissible as a matter of Pennsylvania evidence law, leaving it unreviewable here. Super. Ct. PCRA Op. at 5–6; *Estelle,* 502 U.S. at 67. The Superior Court further ruled that the testimony did not, on its own, suggest that Bey or any of his associates had committed any of the murders or threatened retaliation. Super. Ct. PCRA Op. at 6. It noted that, during his summation, the prosecutor explicitly told the jury that the information regarding the unrelated murders was admitted

solely to explain Thompkins' contradictory statements, and that "I'm not saying, and I want to be fair about this, that Saleem Bey has anything to do with these other killings. There's no evidence of that and that's not why I'm arguing it to you." *Id.* The Court further found that, even if counsel should have sought a limiting instruction, Bey was not prejudiced by the oversight because he "was caught 'red-handed' in the commission of the crime." *Id.* at 6–7.

The Superior Court's determination is not objectively unreasonable, and thus merits deference under the AEDPA. § 2254(d). This portion of Bey's claim should thus be dismissed as meritless. *Cullen,* 131 S.Ct. at 1398.

### B. *Extraneous Violence Argument*

The final piece of Bey's revised claim is that the prosecutor himself made improper references to the unrelated murders and Thompkins' alleged fear of retribution, and his trial attorney failed to address them. Habeas Br. at 14.

Bey argues that the prosecutor lacked evidence to support his theory that the shooting was "a neighborhood thing ... a South Philly thing ... [u]nfinished business ... an execution-style slaying." Habeas Br. at 5, citing N.T. 12/15/05 at 218. Bey claims the prosecutor lacked evidence of: (1) a conflict existing before the shooting; or (2) a connection between Bey and the victims, beyond residing in South Philadelphia. Habeas Br. at 5.

**\*9** This mis-states the record. The prosecutor established, through testimony, that (1) the victims knew each other; (2) at least one of the victims knew Bey; and (3) the victim who died had previously been shot. N.T. 12/13/05 at 68, 86, 189; N.T. 12/14/05 at 16. The prosecution could have successfully presented all of this evidence without making any reference to Thompkins' fear of retribution.

Bey argues that the prosecutor improperly emphasized Thompkins' fear during his testimony by repeatedly asking him to explain his reluctance to testify. Habeas Br. at 14. He also claims the prosecutor and his trial counsel improperly elicited information that Thompkins was then incarcerated for possession of a firearm. *Id.* He further contends that the ballistics expert and coroner improperly testified that the victim's body had evidence of earlier shootings. *Id.* According to Bey, this evidence was improperly admitted because it was: (1) irrelevant to Bey's guilt; (2) hearsay; and (3) more prejudicial than probative. Habeas Br. at 15. He contends "[t]he prosecutor did not argue that the fear/

other murders evidence was relevant to Petitioner's guilt," but simultaneously contends "this is exactly what the prosecutor used the evidence to argue." Habeas Br. at 15–16.

I disagree. Evidence that Bey and the victims knew each other was relevant to prove Bey's guilt. In the absence of evidence of a more specific motive, the prosecutor provided evidence that both victims were carrying thick wads of cash, clearly intending to suggest that Bey might have been on notice that they were potentially lucrative robbery victims. N.T. 12/14/05 at 217 ("The first motive is money"). [2]

Bey lists five quotes from the prosecutor's closing arguments as examples of prejudicial statements to which his counsel ineffectively failed to object. Habeas Br. at 21.

> When I made my opening statement, I told you, I think one word. I asked you—I said one word when Kenneth Thompkins testified. One thing I asked you to keep in mind. I think that word was fear. Fear. Fear is a factor in a murder case.

N.T. 12/14/05 at 227.

> Folks, that was the epitome of fear. He oozed it. You could smell it. He spent his entire time on that stand looking out here to see who was here and who was watching him.

Id. at 227.

> This is a man who deals with death. It's real to him. It is not something he sees on the 6 o'clock news or reads about in the paper. It happens to him.

Id. at 228.

> When I was growing up, I used to have a saying that snitches get stitches. Things have changed. Now they have the snitches get ditches. That's reality. And for Kenny Thompkins those aren't idle threats.

Id. at 229.

> Now, why is he running from me? And why is he running to them? Ask yourself that question. He's afraid to come and testify. Afraid of what and afraid of whom? That's the question.

Id. at 230.

According to Bey, the prosecutor improperly used Thompkins' fear to prove a motive for Swanson's murder, not

to explain his inconsistent statements. Habeas Br. at 21–22. Bey argues that the trial court's single curative instruction, offered in the middle of Thompkins' testimony on the second day of the five-day trial, was constitutionally inadequate. Habeas Br. at 25. He further contends that the Superior Court's determination, that the prosecutor's caveat during closing argument could substitute for a proper limiting instruction, was unreasonable. Habeas Br. at 26–27 n. 20 (citing N.T. 12/14/05 at 229 ("I'm not saying ... that Saleem Bey has anything to do with these other killings.")).

**\*10** The Superior Court's finding, that the jury effectively received the benefit of a limiting instruction when the prosecutor made his disclaimer during closing argument, is not objectively unreasonable. Moreover, Bey has not met the first prong of *Strickland* with respect to his counsel's failure to object to each of the above statements by the prosecutor. First, the information had already been ruled admissible, and counsel cannot be ineffective for failing to bring a meritless claim. *Sanders*, 165 F.3d at 253 Second, the prosecutor's caveat came amidst the very argument to which Bey objects; any objection by trial counsel at that point would have simply highlighted the issue and failed to provide the jury with any limitation to their consideration of the 'fear evidence.' Counsel's failure to object to the prosecutor's arguments regarding Thompkins' fear did not violate *Strickland.*

### C. *Prejudice from Inconsistent Evidence*

Bey argues that the state court's ruling that he could not have been prejudiced by any evidentiary error because of the "overwhelming" evidence against him was an unreasonable determination of the facts in light of the evidence presented at his trial. Habeas Br. at 28. He then describes nine "inconsistencies" that he believes sufficiently undermine the prosecution's evidence to make the above-described evidentiary errors prejudicial when weighed against them. *Id.* at 28–44. As discussed below, the state courts' determination that the evidence against Bey was overwhelming was not unreasonable. It certainly was sufficient to greatly outweigh any prejudice from the scant error he has cited.

### 1. *Inconsistency Regarding Position*

Bey argues that Officer Taylor and Sergeant Walton offered inconsistent testimony regarding their positions, and therefore their ability to see the shooter, when the shooting began. Habeas Br. at 33. At trial, Taylor and Walton testified that they had followed Eagles player Donovan McNabb into the parking lot and had therefore been positioned to view

the shooter. N.T. 12/9/05 at 63; N.T. 12/12/05 at 111–12. In their initial statements that night, however, neither mentioned McNabb. N.T. 12/9/05 at 117; N.T. 12/12/05 at 133. This is not an inconsistency. Walton explained that this statement was just a "summary," and was not intended to provide a detailed account. N.T. 12/9/05 at 179.

2. *Inconsistency Regarding Which Victim*
Bey also argues Officer Taylor's testimony was inconsistent with respect to which victim's shooting he witnessed. Habeas Br. at 33–34. In Taylor's statement the night of the shooting, and in his testimony at Bey's preliminary hearing, he claimed to have witnessed the shooting of Swanson. N.T. 12/12/01 at 9; N.T. 12/9/05 at 73. According to Taylor, he was standing north of the victim and shooter and saw Bey fire the last shot, northwards, as well as the victim's collapse, immediately in front of him. N.T. 12/9/05 at 73–74. Taylor and other witnesses testified consistently that the sequence of gunshots was a single shot followed by a pause and then a series of shots. N.T. 12/9/05 at 69–70; N.T. 12/12/05 at 10, 114–15. Because Swanson sustained a single gunshot wound and was found facing south, while Thompkins was found north of Swanson and sustained four gunshot wounds, Bey argues it would have been impossible for Taylor to have witnessed what he claims. Habeas Br. at 37.

 **\*11**  Bey vastly overstates the significance of this discrepancy. In his trial testimony, Taylor explained that the victim he saw fall was a black male dressed in a dark jacket and jeans and that both victims had sustained gun shot wounds in similar areas: Swanson, in the back of the head, and Thompkins, in the back of the neck. N.T. 12/9/05 at 194, 197. Although Taylor identified Bey due to his distinctive gray sweatsuit and baseball hat, the victims had no such distinguishing clothing. *Id.* at 81–82, 194. The placement of the emptied cartridges, clustered north of Swanson but south of where Thompkins had fallen, suggests that Thompkins was north of the shooter, and could have been shot as Taylor described. N.T. 12/12/05 at 195–97. After arresting Bey, Taylor accompanied him to the police station and immediately gave his statement, which was substantially consistent with the other statements taken that evening, as well as with all forensic evidence in the case. N.T. 12/9/05 at 105.

3. *Inconsistency Regarding Taylor's 11/24/01 Statement*
Bey argues that Taylor's statement from the night of the shooting contains an inconsistent statement that was not

explored at trial: "When I first head the gunshots, I observed the black male, who was transported to Jefferson hospital, laying on the ground with blood near him." 11/24/01 Taylor Statement at 1. According to Bey, if Taylor claimed to have seen Thompkins, already on the ground, when he first heard the gunshots, and later witnessed the shooting of Swanson, his testimony was inconsistent with the forensic evidence. Habeas Br. at 38.

This argument takes a single sentence out of context and ignores the question that prompted it as well as the preceding, entirely consistent paragraph.

Q: Would you go on in your own words and tell me what you observed and did at this time?

A: I was directing traffic out of the rear lot, when I heard a gunshot, followed by approximately six or seven more shots. I observed a black male, in a gray sweat suit running towards me, fire a shot at another black male and continued running towards me. I drew my weapon and pointed it at the male and ordered him to stop. The male turned to his left and ran behind parked vehicles. At this time Sergeant Walton was to my right. I informed him that the male in gray who ran behind the vehicle, just shot a male and was armed with a gun. The male in the gray, squatted down then begin to run behind the vehicles towards Callowhill street. I went in foot pursuit of the male in gray and observed two police officers running towards me. I told them to stop the male in the gray. I chased the male for approximately another 50 feet and with the help of the other two officers I was able to box him in and cuff him. Medic # 1 arrived on location and pronounced the male who I saw get shot by the male in gray.

Q: How many people were shot at this location?

A: Two

Q: The male that you saw get shot, was he facing you or the shooter?

 **\*12**  A: It happen so fast, it appeared that the male who I saw get shot was facing my direction, and the shooter came up from behind him. When I first heard the gunshots I observed the black male, who was transported to Jefferson Hospital, laying on the ground with blood near him.

11/24/01 Taylor Statement at 1.

Taylor's testimony regarding the two victims' similar clothing clarifies this part of the statement as easily as it does his other confusion over which victim's shooting he witnessed.

### 4. Inconsistency Regarding The Chase

Bey argues that the testimony of Officers Taylor and Ferrero was inconsistent regarding "eye contact and the direction of flight." Habeas Br. at 39. First, Taylor testified that he ran "right past" Bey, N.T. 12/9/05 at 75, without making eye contact with him, and then he testified that, as Bey got within 15 feet of him, Taylor "began to shout at him," *id.* at 76, they "made complete eye contact," and Bey "immediately ran to his left," *id.* at 78. Ferrero testified that, when he first saw Taylor, Taylor was "running southbound" "chasing a male," while Ferrero and his partner were "running north." N.T. 12/12/05 at 16. According to Ferrero, Taylor was "screaming, gray sweat suit and hat. He's the shooter. He's the shooter." *Id.* at 17. The first time Ferrero was able to see Bey, however, Bey was "running ... west" away from Taylor. *Id.* at 18.

There is no inconsistency here. Taylor testified that he "moved forward after the first shot" and took cover on the east side of the alleyway behind a parked vehicle. N.T. 12/9/05 at 144. Because he was positioned north of the shooting, Taylor moved south when he moved forward. After he saw Bey shoot the second victim and continue running north, Taylor yelled at him to stop, and Bey looked around in an effort to see where Taylor was located while continuing to run north. *Id.* at 76. After making eye contact with Taylor, who was east of him—to his right—Bey made a left and ran west, away from Taylor. *Id.* at 78, 154. Ferrero's testimony was entirely consistent with this version of events. N.T. 12/12/05 at 18, 66.

### 5. Inconsistency Regarding Bey at the Nissan

Bey argues the officers' testimony was also inconsistent with respect to whether he went to the driver's side of the Nissan, where the murder weapon was later found, during the chase, or whether he stayed on the passenger side of the vehicle. Habeas Br. at 39 n. 27. The officers testified that, after cutting west and crouching behind several cars, Bey tried to work his way north, towards the alley's exit onto Spring Garden Street. N.T. 12/9/05 at 78–83; N.T. 12/12/05 at 18–24. Once he reached the back of the white Nissan parked at the Northwest corner of the alley, Bey turned back around and tried to escape southwards. *Id.* According to Bey, Taylor inconsistently claimed Bey had "never made it to" the driver's side of the car, N.T. 12/9/05 at 161, while Ferrero testified that he had, N.T. 12/12/05 at 23.

**\*13** Again, there is no inconsistent testimony. Taylor's original testimony was that Bey "got down, like in a squatting position" after running westward toward the wall of the industrial building on the west side of the alleyway. N.T. 12/09/05 at 79. A series of cars were parked against the wall at that time. *Id.* at 78. In response to questions from the District Attorney, Taylor clarified that Bey "crouched down in this area towards the rear passenger side" of the white Nissan. *Id.* The District Attorney asked Taylor, "what happened once [Taylor] saw Saleem Bey get back down in a crouched position behind the white Nissan Maxima," and Taylor testified that, "[o]nce at that Nissan Maxima, I could still see the top of his head, where he was at. And that's where I seen him make it to at this point, this location." *Id.* at 82. Like most of the witnesses, Taylor utilized a scaled diagram of the alley the prosecution had produced as a demonstrative exhibit to explain the locations to the jury. *Id.* at 56. The next thing Taylor saw Bey do was get up and move southwards, along the wall behind the parked cars. *Id.*

On cross-examination, Taylor was asked whether Bey ever "went on the other side of the car." *Id.* at 161. In response, Taylor testified that Bey "never made it to the other side of the car, no." *Id.* Ferrero testified that Bey "crouched from the passenger side of the car all the way around the driver's side, got to about the corner right here, and then he popped back up and ran southbound along the wall." 12/12/05 N.T. at 23. Neither officer testified that Bey emerged on the passenger side of the car. Both testified that he crouched behind the back of the car and then turned south. Whether Bey's bobbing head last appeared at the northwest or southwest rear corner of the car is immaterial because anyone could easily toss a handgun behind the rear driver's wheel, where the murder weapon was recovered, from either location.

### 6. Inconsistency Based on a Deficient Investigation

#### a. Police Testified Inconsistently Regarding Witnesses

Bey also complains that the evidence against him was not overwhelming because the investigation into the murder was clearly deficient. Habeas Br. at 42–44. First, he complains that the officers testified inconsistently as to whether there were any civilian witnesses who could have been interviewed. Habeas Br. at 40. n. 27. Again, the state courts' factual findings were not unreasonable. Bey's claim is meritless.

Bey tries to manufacture an inconsistency where none exists. He claims Taylor testified that, by the time he

was handcuffed, no civilian witnesses remained, and cites numerous other officers who referenced other potential witnesses in the area at that time. Habeas Br. at 40, n. 27, citing N.T. 12/9/05 at 148, N.T. 12/12/05 at 34, 48, 98, 104–105 and Wilson Statement. This is misleading. The portion of Taylor's testimony cited refers specifically to the middle of the alleyway itself, as prior and subsequent testimony makes clear. N.T. 12/9/05 at 131–32, 198–200. The other citations are entirely consistent and reflect that potential witnesses were interviewed and failed to provide relevant information.

b. *The Jury Thought the Investigation Was Deficient*

 **\*14**  Next, Bey argues that the jury's questions to the judge suggest that it doubted Taylor's testimony. Habeas Br. at 40–42. The jury reached a verdict after approximately four hours of deliberations. N.T. 12/15/05 at 29, 40 (describing the jury exiting the courtroom to begin deliberating at 11:10 a.m. and returning to deliver a verdict at 3:15 p.m.). "[E]arly on in the jury's deliberations," *id.* at 34, the jury requested the transcript of Taylor's testimony "describing from the time the officer heard the first shot to when defendant ran west towards the wall," as well as Taylor's "statement" in which he "says he saw the defendant shoot Swanson." N.T. 12/15/05 at 30, 37. In response, the trial judge told the jury they would only have a copy of Taylor's testimony, at the earliest, the next morning, *id.* at 36, and that he needed clarification regarding the second request, *id.* at 39–40.

The jury came to its verdict without clarifying its second request or waiting for the transcript to become available. Bey argues that the requests "show that at least some portion of the jury was having some difficulty with Taylor's testimony," but the fact that the requests were made "early" in the deliberations and the second request was never clarified suggests otherwise. Habeas Br. at 42. Rather than showing that the evidence "was not overwhelming," the jury's requests establish that it approached its task responsibly, quickly focusing on the most important testimony with a willingness to scrutinize it for any inconsistencies. As discussed above, however, even with the benefit of transcripts and counsel, Bey is able to point to no inconsistencies, and the jury was apparently quickly able to come to the same conclusion.

c. *The Investigation Failed to Include Witnesses*

Next, Bey argues that the police improperly let potential witnesses leave the scene of the crime, including the people in an S .U.V. that was stopped between Swanson's body and Officer Ferrero's car during the second series of shots, and

an individual that collided with Sergeant Walton during the pursuit of Bey. Habeas Br. at 42–43. Although it may have been helpful to determine whether the people in the S.U.V. witnessed anything, Bey offers no evidence or even argument that the absence of these potential witnesses undermines the trial evidence. Moreover, the suggestion that the identity of the individual who collided with Sergeant Walton is "critical" because the collision occurred "in proximity to where the murder weapon was recovered" lacks merit. As the prosecutor noted during closing arguments:

[T]hey don't have a collision back at the rear of the car where the gun was found; it was in the front of the car. Walton grabs that guy because at that point he's not sure where he came from and who he is, make sure that it's not the defendant. I don't know.

Was there some argument here or implication then that's the guy with the gun and that's the guy that took the gun behind the car? Because that's completely implausible. Here's Sergeant Walton thinking he might be the guy with the gun, but he doesn't see the gun this guy supposedly has. Why is that? If it is not in his hands, then that means he has it inside his jacket somewhere, in his pants pocket; and if he does, then since the sergeant grabbed him momentarily and let him go, why then would he then reach into where the sergeant didn't see or find the gun and take the gun out within a couple of feet under the sergeant when the sergeant now has let him go? That makes no sense to me or it shouldn't make any sense to you whatsoever.

 **\*15**  N.T. 12/14/05 at 203.

d. *The Investigation Lacked a Gunpowder Residue Test*

Finally, Bey argues the police investigation was deficient because he was not tested for gunpowder residue. Habeas Br. at 43. At trial, Officer Wilson testified the test was not administered because Bey's hands were not bagged immediately, which meant the results of the test would be unreliable. N.T. 12/13/05 at 40. Again, Bey fails to explain how the absence of one particular kind of evidence reduces the quantum of evidence that was presented or undermines it in any other way.

Bey fails to identify any inconsistencies or gaps in evidence that undermine the verdict. Thus, the state court's description of the evidence as "overwhelming" is not an unreasonable determination of the facts. § 2254(d). Because the state court reasonably found the evidence against Bey "overwhelming,"

10

its determination that any error in admitting Detective Mosley's testimony regarding the six unrelated murders was harmless is also a reasonable application of clearly established Supreme Court law. *Id.* This portion of Bey's first claim is meritless. The other portions of Bey's first claim fail to establish prejudice in light of the overwhelming evidence that was presented against Bey at his trial. Because counsel cannot be deemed ineffective for failing to pursue a meritless claim, *Sanders,* Bey has not met his burden under the first prong of *Strickland,* and thus has not established that he lacked effective PCRA counsel. Without ineffective PCRA counsel, the procedural default of these claims cannot be excused under *Martinez,* and they are procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1.

## II. *Faulty Kloiber Jury Instruction* [3]

Bey alleges trial counsel was ineffective for failing to object to the court's *Kloiber* instruction because it failed to inform the jury it could receive the eyewitness testimony with caution and created a conclusive presumption that the eyewitness' certainty made his identification unassailable. Habeas Br. at 44.

The PCRA and Superior Courts found Bey's ineffectiveness claim meritless, relying on Pennsylvania Supreme Court precedent that had previously upheld the challenged language. PCRA Ct. Op. at 11–12; Super Ct. PCRA Op. at 7–8. Here, Bey argues the state courts unreasonably found the instruction proper under state law, and that they unreasonably found it failed to create an unconstitutional presumption. [4] Habeas Br. at 47–50. The following instruction was given:

Where a witness is positive in his identification, such as where the opportunity for positive identification is good and the witness is positive in his identification and the identification has not been weakened by any prior failure to identify but remains even after cross-examination positive and unqualified, the testimony as to identification may not be received with caution. Indeed, positive testimony as to identity may be treated as a statement of fact.

**\*16** On the other hand, if you believe that a witness was not in a position to clearly observe and was not in a position because of lighting and/or conditions, then you may use that as a factor in determining whether or not that the person actually had the opportunity to observe that which he testified to and a positive identification of a defendant by one witness is sufficient for a conviction.

N.T. 12/15/05 at 15–16.

Viewing the instructions as a whole, *see Boyde v. California,* 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the jury was instructed about its responsibility to weigh the credibility of witnesses for approximately nine transcribed pages. N.T. 12/15/05 at 6–11, 14, 15–16. Only two of those pages contained the *Kloiber* instruction. *Id.* at 15–16, 106 A.2d 820. Having been cautioned extensively about its responsibility to weigh the credibility of each witness, Bey cannot establish that the jury would have believed it was required to find Taylor's testimony credible. Habeas Br. at 51. The Pennsylvania courts' determinations of state law are unreviewable, *Estelle,* and its determinations of federal law were objectively reasonable. § 2254(d); *Henderson v. Kibbe,* 431 U.S. 145, 153, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (even a deficient jury instruction does not abrogate a judgment as long as jurors are informed of the correct legal standard by the instructions as a whole). Thus, counsel's failure to raise a meritless claim did not violate the Sixth Amendment. *Sanders,* 165 F.3d at 253.

## III. *Batson Claim* [5]

Trial counsel made a *Batson* objection to two of the prosecutor's peremptory challenges to strike African–American women from the venire. N.T. 12/6/05 at 113; N.T. 12/7/05 at 29. In both cases, the trial judge requested an explanation from the prosecutor, and heard argument from trial counsel as to why those explanations were pretextual. N.T. 12/6/05 at 114–19; N.T. 12/7/05 at 29–35. In both cases, the trial judge accepted the prosecutor's explanations and overruled the *Batson* challenge. N.T. 12/6/05 at 119; N.T. 12/7/05 at 34–35. In his Rule 1925 opinion, the trial judge found that the Commonwealth's explanations were "not pretextual excuses." 1925 Op., 1864 EDA 2006 (May 8, 2007), attached as Exhibit B of Exhibit C to Habeas Br., at 7. The trial judge concluded that "the facts did not establish a prima facie case for purposeful discrimination in the prosecution's use of peremptory challenges in jury selection." *Id.* at 8. On appeal, the Superior Court found the *Batson* claims were waived by counsel's failure to correctly follow Pennsylvania appellate procedure but that, if they had not been waived, they would have been found meritless because the trial court made reasonable credibility determinations during jury selection when he found the Commonwealth's reasons to excuse were not pretextual and upheld the prosecutor's peremptory strikes. Super. Ct. Op. at 8–9.

The Equal Protection Clause prohibits the use of peremptory challenges to purposefully exclude potential jurors based on race or gender. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Batson,* 476 U.S. at 89. A defendant establishes a prima facie case where the evidence is sufficient to permit the trial judge to draw an inference that discrimination has occurred in the prosecutor's use of peremptory challenges. *Johnson v. California,* 545 U.S. 162, 170, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005). Five factors are relevant to the prima facie inquiry: (1) the number of racial or gender group members in the panel; (2) the nature of the crime; (3) the race or gender of the defendant; (4) a pattern of strikes against racial or gender group members; and (5) the questions and statements during voir dire. *Holloway v. Horn,* 355 F.3d 707, 722 (3d Cir.2004); *see Batson,* 476 U.S. at 96.

**\*17** If a prima facie showing is made, the prosecutor must "give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." *Batson,* 476 U.S. at 98 n. 20. The sole issue is the facial validity of the explanation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam) (quoting *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion)); *see Hardcastle v. Horn,* 521 F.Supp.2d 388, 395 (E.D.Pa.2007) (Padova, J.), *aff'd,* 332 F. App'x. 764 (3d Cir.2009).

After finding the prosecutor presented race-neutral (or gender-neutral) reasons for the strikes, a court must consider the persuasiveness of the justifications. *Purkett,* 514 U.S. at 768. A defendant "must establish, by a preponderance of the evidence, that [the prosecutor's] decision to strike at least one juror at [his] trial was motivated at least in part by race." *Hardcastle,* 521 F.Supp.2d at 401 (citing *Wilson v. Beard,* 314 F.Supp.2d 434, 446 (E.D.Pa.2004), *aff'd,* 426 F.3d 653 (3d Cir.2005)). "[T]he critical question in determining whether a [defendant] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller–El v. Cockrell,* 537 U.S. 322, 338–89, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). A court should consider "how reasonable, or how improbable, the explanations are[,] and ... whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

A. *Standard of Review*

Bey contends that, by addressing the merits of his *Batson* claim solely as an alternative to its actual holding that the claim was waived, the Superior Court failed to address the claim's merits, and therefore no deference is owed to the Superior Court's decision. Habeas Br. at 61. The Commonwealth responds that the claim is defaulted and non-reviewable, but that if it is reviewed, the trial court's "credibility-based finding that the prosecutor had no discriminatory intent" should be considered a factual finding presumed correct under the AEDPA unless Bey can rebut that presumption by clear and convincing evidence. Cmwlth Br. at 47–49.

Bey's *Batson* claim is procedurally defaulted because Pa. R.A.P.1925 is an "independent and adequate" basis for the Superior Court's finding. *Buck v. Colleran,* 115 F. App'x. 526, 52728 (3d Cir.2004). There are instances, however, in which the Superior Court's application of Pa. R.A.P.1925 to waive a Petitioner's claim may itself be reviewable. *Id.* (finding the Superior Court "justified" in its waiver finding, and that petitioner was "not without fault" in violating Pa. R.A.P.1925). In an abundance of caution, I alternatively find that, even if I were to review the merits of the claim, it would fail. In doing so, I grant the Superior Court's alternative ruling on the merits of the *Batson* claim the full deference owed state court determinations under the AEDPA. § 2254(d).

B. *Juror # 50*

**\*18** Bey's trial counsel first raised a *Batson* challenge to the prosecutor's eighth peremptory strike, claiming that seven out of eight struck jurors had been black females, and the other struck juror had been a female of another minority group. N.T. 12/6/05 at 113. Without making an explicit finding that counsel had established a prima facie case, [6] the trial judge asked the prosecutor for "any reason why you struck the last juror." *Id.* at 114. The prosecutor laid out three reasons for his strike: (1) the juror had expressed hesitancy about imposing the death penalty; (2) she had a child close in age to the defendant; and (3) she worked with elementary public school children. *Id.* at 115. The prosecutor also disputed counsel's numbers, claiming one of the women he had struck was white, and further argued that, because three of the eight jurors that had been seated were black and two were black females, no prima facie showing had been made of racial discrimination. *Id.* at 116. Trial counsel responded that all eight strikes had been against women and seven had been minority women, and demanded an explanation of "every single one." *Id.* at 117. Before the prosecutor

could respond, the trial judge denied the motion, but the prosecutor explained that one woman had an arrest record, another was unemployed, another was working and attending school simultaneously, and another "had an uncle arrested for drugs." *Id.* at 118. The trial judge cut him off, explaining he was "satisfied" that there was "no *Batson* issue ." *Id.* at 119.

Bey argues that each of the reasons used to justify Juror # 50's exclusion was pretext because other jurors with the same characteristics were acceptable to the prosecution. Habeas Br. at 56–58 (prosecutor accepted four jurors with children in their twenties, three who worked with young children and another that expressed hesitancy about the death penalty). The Commonwealth responds that it was the combination of characteristics in Juror # 50 that made her unacceptable to the prosecution and that therefore none of Bey's comparators were "similarly situated." Cmwlth. Br. at 59. It also addresses each of the comparator jurors' race-neutral characteristics that made them "attractive to the prosecution as jurors." *Id.* at 59 n. 20. Bey disputes the legality of the Commonwealth's "combination" argument, and contends many of the comparators' "attractive" qualities were mirrored in Juror # 50. Reply (doc. 15) at 22–23. The Commonwealth claims the trial court's reasonable credibility determination is owed significant deference under the AEDPA, Sur–Reply (doc. 17) at 13, although Bey argues the state court's finding was unreasonable because the trial court failed to "proceed to the third step of the *Batson* analysis" and even assess whether the prosecutor's explanations were pretextual, Resp. to Sur–Reply (doc. 18) at 10.

In his 1925 Opinion, the trial judge addressed Bey's argument that "each reason given by the Commonwealth for its use of a peremptory challenge was a pretextual excuse and therefore he is entitled to a new trial." 1925 Op. at 7. The trial judge stated that "[w]hile the Defendant may not like the reasons given by the Commonwealth, they were not pretextual excuses." *Id.* The Superior Court's determination, that the trial judge had made a reasonable credibility determination after "vigorous" objection by trial counsel, fairly reflects the record in this case, Super. Ct. Op. at 8; N.T. 12/6/05 at 113–20. *Rico v. Leftridge–Byrd,* 340 F.3d 178, 185 (3d Cir.2003) (at step three, the trial court must determine whether the prosecutor's race-neutral explanations are credible based on, inter alia, the reasonableness of the explanations and the prosecutor's demeanor) (citing *Miller–El,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931), and the Superior Court's determination of these facts is not unreasonable in light of the evidence

presented, § 2254(d). Juror # 50 expressed considerable confusion about her potential role in imposing the death penalty.

> **\*19 Juror # 50:** I know I raised my hand this morning. I thought it would be the jurors' sole decision to say death or life. I didn't know we were going to be instructed, so that's why I raised my hand earlier. I didn't know we were going to get some kind of instructions.

**Prosecutor:** You will get some instructions, but it will be the jurors who decide whether it's life or death.

**Juror # 50:** Well, I thought we would officially be making that decision not that we would be told life or death.

**Prosecutor:** I don't follow you. What did you think is going [to] happen?

**Juror # 50:** We will have to decide whether it's going to be life or death after being instructed on, I guess, the guidelines. I thought that we would be the only ones who made the decision whether it would be life or death without any kind of instructions.

**Prosecutor:** All right. Without any instructions?

**Juror # 50:** Right.

**Prosecutor:** All right. Do you understand the instructions won't tell you what?

**Juror # 50:** I understand that.

N.T. 12/6/05 at 110–11.

The prosecutor conceded that her clarification was inadequate to justify a strike for cause, but maintained it was unclear "that she understands what's going to be involved when the issue of death penalty comes up." *Id.* at 114–15. The Notes of Testimony support his concern. *Id.* at 110–11. Moreover, the prosecutor's two other explanations work together to further justify the strike. The prosecutor explained that in his "experience from 18 years of prosecuting cases ... educators who work with children sometimes find it difficult to sit in judgment of defendants who are particularly young." *Id.* at 115. A general concern about impaneling educators for cases with young defendants combined with a concern that the specific defendant in the case was close in age to the juror's own son is sufficient to justify the prosecutor's peremptory challenge without referencing constitutionally-impermissible categories. *Miller–El,* 537 U.S. at 339 (credibility can be

determined by, inter alia, "whether the proffered rationale has some basis in trial strategy.").

Because the Superior Court reasonably upheld the trial court's credibility determination, Bey can point to no unreasonable application of clearly established Supreme Court law, and his claim must fail. § 2254(d); *Metrish v. Lancaster,* ––– U.S. ––––, ––––, 133 S.Ct. 1781, 1787, 185 L.Ed.2d 988 (2013) (to justify habeas relief, any legal error made by a state court cannot be subject to "fairminded disagreement") (quoting *Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 786–87, 178 L.Ed.2d 624 (2011)).

### C. *Juror # 13*

The next day, trial counsel raised another *Batson* challenge to a peremptory strike, explaining "it's another black female." N .T. 12/7/05 at 29. The trial judge ordered the prosecutor to "[g]ive an explanation why you challenged her." *Id.* The prosecutor offered two reasons: (1) her residency in South Philadelphia; and (2) her pregnancy. *Id.* at 29–31. He explained that he had reason to believe that Bey's previous jury "may have hung as the result of the possible influence on the jury." *Id.* at 29. He described juror intimidation as an "epidemic," *id.,* and contended that, even though she had not recognized the names of the defendant or victims, there was a "strong possibility," *id.* at 30, that she could know someone in the gallery during the trial, because even during jury selection there had been "over two dozen people" at court each day, *id.* The prosecutor stated he would, as a rule, "exclude jurors who live in South Philadelphia on a case involving parties from that area." *Id.* at 30. He further argued she was "8 months pregnant," and noted that "jury duty can be very stressful on a person." *Id.* He noted that it was winter, and expressed concern about her ability to get to court during "heavy snow storms or icy conditions," or her ability to "actively participate" once she arrived. *Id.* at 30–31.

**\*20** The trial judge immediately expressed satisfaction with the prosecutor's explanation, but allowed trial counsel to respond. *Id.* at 31. Bey's counsel urged the trial judge to reject the prosecutor's contention regarding potential jury tampering because he had offered no evidence to support it, and had not requested sequestration. *Id.* at 31–32 ("you can't say that's a valid reason, Your Honor, when he stands up and makes a statement when there's nothing to back it up."). He described the objection to South Philadelphia jurors as "disingenuous" because the juror had "specifically stated that she does not know this defendant, did not know any of the names of the witnesses in this case." *Id.* at 32. He contended that "to strike

somebody as a rash reason that on off chance that she may sometime in the future know somebody in this case is not a rational reason to do it." *Id.*

Trial counsel also challenged the prosecutor's concern about her pregnancy as pretextual because she had "100 percent answered those questions." *Id.* He argued that if the possibility of bad weather was sufficient to strike jurors "we won't have old people on the jury." *Id.* He pointed out that she was then working, and had "absolutely no problem physically." *Id.* at 33. The prosecutor responded that, if accepted, she would have been one of the principal jurors who could not be replaced once deliberations started and that, because she was nine months pregnant, "[a]nything can happen ... [a]nd if I lose her we have a mistrial. *Id.* at 33–34.

The trial judge stated he was "satisfied with the pregnancy issue," but found "the South Philadelphia excuse is just not acceptable" because it was "to[o] wide a range. *Id.* at 34. Both the prosecution and trial counsel then made statements for the record: the prosecutor stated that he had made sure, up to that point, that none of the eight jurors selected lived in South Philadelphia, and the trial counsel stated that the court's acceptance of her health as justification for her strike was contrary to the evidence because she had "six weeks to go" and "[t]his case is scheduled to end next week." *Id.*

In his 1925 opinion, the trial judge incorrectly reported he had found the prosecutor's objections to Juror # 13 invalid and seated her, although he also stated the Commonwealth's reasons "were not pretextual excuses." 1925 Op. at 7. The Superior Court reviewed the Notes of Testimony and deferred to the trial court's original credibility determination because the prosecutor had objected not based on the juror's "current obstacles," but based on the enhanced possibility of future problems that could impede her service. Super. Op. at 9.

The Equal Protection Clause prevents discrimination in jury selection on the basis of gender as well as race. *J.E.B.,* 511 U .S. at 129. Only women can be pregnant. Thus, clearly established Supreme Court precedent would prohibit striking women solely on this basis, without further justification. Other courts analyzing peremptory challenges explained by pregnancy require specific reference to of what aspect of jury service would be particularly difficult for a pregnant woman. *See, e.g., Brawner v. Epps,* 439 F. App'x. 396, 409 (5th Cir.2011) (explaining the courthouse had no air conditioning, which had recently been problematic for another pregnant juror); *Starling v. State,* 882 A.2d 747, 754 (Del.Super.2005)

(referencing the "ill effects of stress"); *State v. Martin,* No. A10–124, 2010 WL 4721342, *3 (Minn.App. Nov.23, 2010) (finding no "inherent discrimination" in peremptory strike against pregnant woman because victim had been lying next to an infant); *but see U.S. v. David,* 844 F.2d 767, 768 (11th Cir.1988) (finding pregnancy justification for striking black juror was not a pretext for racial discrimination); *Hollowell v. State,* 59 Ark. App. 39, 953 S.W.2d 588, 591 (Ark.App.1997) (upholding determination of trial judge who had allowed strike against juror on the basis of "pregnant" but warned that "[i]f you are going to excuse all the women, I'm not going to let you unless there's some sort of reasoning").

**\*21** Here, the prosecutor noted the juror was late in her pregnancy and that it was winter. N.T. 12/7/05 at 30–31. The Superior Court's opinion upholding the trial court's credibility determination was not based on an unreasonable determination of facts or an unreasonable application of law and merits deference under the AEDPA. *§ 2254(d).*

IV. *5th Amendment Claims based on the prosecutor's closing argument*

Bey makes two claims that his counsel was ineffective for failing to stop the prosecutor from violating his fifth amendment rights during closing argument by: (1) impermissibly arguing that Bey's failure to turn over Thompkins' 2002 and 2004 statements to his prior defense counsel suggested he did not believe they were true; and (2) impermissibly arguing that his decision not to testify should be held against him by rhetorically asking why Bey had run from the police if he was innocent. Habeas Br. at 64, 67.

The Commonwealth contends that both claims, which were not presented to the state courts, were procedurally defaulted, and are in any case meritless. Cmwlth. Br. at 84. Bey responds that any procedural default must be excused under *Martinez* because they are substantial claims that would have been brought by an effective PCRA counsel. Reply at 29–30.

I need not delve into the merits of either claim, because even if they had merit, the overwhelming evidence presented against Bey establishes he suffered no prejudice under *Strickland.* [7] Because PCRA counsel cannot be held ineffective for failing to pursue a meritless claim, *Sanders,* 165 F.3d at 253, Bey's procedural default is not excused under *Martinez,* and this claim is procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1.

V. *Faulty Silence Instruction*

Bey further alleges that trial, appellate, and PCRA counsel were ineffective for failing to object to the court's instruction that his decision not to testify not be held against him, since the jury was only instructed that it could not infer guilt from this decision, not that it was also prohibited from making any other adverse inference against him. Habeas Br. at 70. The Commonwealth contends this claim is procedurally defaulted and meritless, and the trial court's instruction complied with *Carter v. Kentucky,* 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). Cmwlth. Br. at 89.

Even assuming that the instruction did not comply with *Carter,* any error was harmless because of the overwhelming evidence presented against Bey. *Lewis v. Pinchak,* 348 F.3d 355, 358 (3d Cir.2003) ("*Carter* errors are subject to harmless error analysis") (interpreting *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). PCRA counsel cannot be held ineffective for failing to pursue a meritless claim, *Sanders,* 165 F.3d at 253, and Bey's procedural default is not excused under *Martinez.* This claim is procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1.

VI. *Faulty Reasonable Doubt Instruction*

**\*22** Bey also argues trial counsel erred in failing to object to the reasonable doubt instruction, which permitted the jury to choose between the "hesitate" to act or "refrain from acting" standards, in violation of the constitution. Habeas Br. at 72–73. The Commonwealth responds that the ineffective assistance of trial counsel version of this claim was addressed by the state courts, while the free-standing objection to the instruction itself is procedurally defaulted. Cmwlth. Br. at 89–92.

I agree. Bey makes no argument that would excuse the procedural default of a claim challenging the constitutionality of the instruction itself, and the Superior Court decision is not an unreasonable application of clearly established Supreme Court precedent or based on an unreasonable determination of the facts. *§ 2254(d);* Super. Ct. at 8; PCRA Ct. Op. at 8. The exact language used in this instruction has been upheld by the Pennsylvania and federal courts. *Commonwealth v. Romero,* 595 Pa. 275, 938 A.2d 362, 380 (Pa.2007); *Labrake v. Stowitzky,* 2009 WL 2854747, *11–13 (E.D.Pa. Sept.3, 2009).* Trial counsel could not be ineffective for failing to pursue this meritless claim. *Sanders,* 165 F.3d at 253.

### VII. *Vouching/Misstating by the Prosecution*

Bey alleges trial counsel's failure to object to a variety of errors by the prosecutor caused the trial to become infected by improper vouching and misstatement of evidence in violation of due process. Habeas Br. at 67. The Commonwealth contends this claim is procedurally defaulted and meritless. Cmwlth. Br. at 92–95.

Bey and the Commonwealth agree that any potential due process violation must be assessed against the "quantum of evidence against the defendant." Habeas Br. at 84 (citing *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir.2001); Sur-reply at 18 (citing *Brecht,* 507 U .S. at 637). As discussed above, the evidence against Bey was overwhelming. Even assuming I credited each of the complaints he cites as improper behavior by the prosecutor, the combination would still not have "infect[ed the] trial with unfairness" in violation of due process. *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Thus, Bey's procedural default fails to satisfy either prong of *Martinez.* Addressing the second prong first, his claim fails to state a "substantial" due process claim. *Martinez,* 132 W. Ct. at 1318–19 (citing *Miller–El v. Cockrell,* 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), which requires a "general assessment" of the merits and a determination of whether "reasonable jurists could debate" its outcome. Because the claim is meritless, PCRA counsel could not be ineffective for failing to pursue it. *Sanders,* 165 F.3d at 253. Bey's procedural default is not excused under *Martinez,* and his claim should be dismissed as procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1.

### VIII. *Derringer Argument*

Bey also argues trial counsel was ineffective for suggesting, during closing arguments, that he ran from police because he was illegally in possession of the Derringer gun found at the scene of the crime. Habeas Br. at 87–89. The Commonwealth responds that this argument is procedurally defaulted and meritless; although it was pursued on appeal by appellate/ PCRA counsel, it was dropped before it could be addressed by the Superior Court. Cmwlth. Br. at 9697. Bey argues that PCRA counsel's failure to pursue the argument constituted ineffective assistance, excusing his procedural default under *Martinez.* Reply at 40.

**\*23** The effectiveness of PCRA counsel is judged by the *Strickland* standard. *Martinez,* 132 S.Ct. at 1318. An effective appellate advocate should pursue only the strongest

claims and "winnow" the weaker arguments. *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Bey fails to demonstrate PCRA counsel acted with unreasonable professional judgment to drop this claim before it was exhausted, and therefore fails to satisfy the first prong of *Martinez.* His procedural default cannot be excused. *Coleman,* 501 U.S. at 735 n .1.

### IX. *Misstating by Trial Court*

Bey further argues trial counsel erred by failing to request a mistrial in two instances: (1) when the trial judge interjected that he would not have expected a witness that had been arrested pursuant to a bench warrant he issued to have been prosecuted for contempt as long as his presence was procured for trial; and (2) when the judge mis-stated the testimony of a crime scene investigator during clarification of a question. Habeas Br. at 90–93. The Commonwealth responds that this claim is procedurally defaulted and meritless. Cmwlth. Br. at 97–98.

On its face, this claim fails to meet the second prong required to excuse procedural default under *Martinez.* No reasonable jurist can contend that these two alleged errors could have "pervaded the overall fairness of the proceeding" and deprived Bey of due process. *United States v. Wilensky,* 757 F.2d 594, 598 (3d Cir.1985). In fact, these were not errors. In the first instance, the trial judge explained a bench warrant that he himself issued. N.T. 12/13/05 at 168. Regardless of the inference trial counsel intended to draw from the court's order, the court could not have erred by instructing the jury as to the actual intent behind his own order. In the second instance, the trial judge posed a question to a witness that reflected an apparent misunderstanding of the evidence presented. N.T. 12/12/05 at 206. The witness, however, was responsible for any incorrect answer, not the trial judge. Bey has failed to identify any trial court errors in this claim, let alone any that rose to the level of a constitutional violation, and therefore PCRA counsel cannot be found ineffective for failing to pursue a claim that trial counsel was ineffective for failing to object to these non-existent errors, and Bey's procedural default cannot be excused under *Martinez.* This claim is procedurally defaulted. *Coleman,* 501 U.S. at 735 n. 1.

### X. *Character Witnesses*

Finally, Bey contends trial counsel was ineffective for failing to effectively prepare the character witnesses that testified to his reputation for non-violence. Habeas Br. at 93–95. Again, the Commonwealth responds that the claim is meritless and

procedurally defaulted, and Bey replies that the procedural default is excused by PCRA counsel's ineffective failure to pursue the claim in state court. Cmwlth Br. at 99–100; Reply at 43–45.

**\*24** Bey contends trial counsel was ineffective for failing to discover beforehand that his character witnesses would not be able (or willing) to identify an individual with whom he or she had discussed Bey's reputation for non-violence, and that, because of this failure, their testimony "produced the exact opposite effect as intended." Reply at 44. Because of Bey's juvenile adjudications, his character witnesses were limited to testimony regarding his reputation for nonviolence. N.T. 12/14/05 at 28–35. Six people, all selected for their close relationship with Bey and their own standing in the community, testified in succession to his good reputation for nonviolence. N.T. 12/14/05 at 44–67 (testimony by: (1) a social worker that knew Bey since he was four; (2) an older friend of his family that volunteers to referee basketball games in his community; (3) an older cousin that works with youth in the community; (4) a certified nursing assistant and friend of his family that had known Bey all his life; (5) another cousin that plays professional basketball in Europe and has known Bey all his life; (6) another friend of the family and professional basketball player in Europe who was able to identify an individual with whom he had discussed Bey's reputation for non-violence, *id.* at 68–69).

My review of the transcripts establishes it is unclear that this testimony prejudiced Bey. On its face, the testimony could surely have been stronger, but also cannot fairly be said to have unraveled on cross-examination, as Bey claims. *Id.* Because the burden of proof in a criminal trial never shifts from the prosecution, it is unlikely that Bey would have been better served by the absence of character testimony to his non-violent nature, regardless whether they were able to identify individuals with whom they had discussed his reputation for non-violence. Bey presents no viable argument that the decision by his PCRA counsel not to pursue this marginal claim violated *Strickland*. *Jones,* 463 U.S. at 751–52. Bey fails to demonstrate that failure to bring this claim meets the first prong of *Martinez,* and his procedural default cannot be excused. *Coleman,* 501 U.S. at 735 n. 1.

XI. *Request for Evidentiary Hearing*

Footnotes

Bey also requests an evidentiary hearing, based on the above arguments. Habeas Br. at 96. The Commonwealth contends no hearing is warranted. Cmwlth. Br. at 1.

Bey's request for an evidentiary hearing is denied. I have discretion to grant a hearing. *See Campbell v. Vaughn,* 209 F.3d 280, 287 (3d Cir.2000). I must focus on "whether the hearing would be meaningful, in that a hearing would have the potential to advance the petitioner's claim." *Id.* A petitioner bears the burden of showing the hearing would be meaningful, by "forecast[ing] ... evidence beyond that already contained in the record" that would help his cause, 'or otherwise ... explain[ing] how his claim would be advanced by an evidentiary hearing.' " *Id.* (quoting *Cardwell v. Greene,* 152 F.3d 331, 338 (4th Cir.1998)).

**\*25** Based on my foregoing analysis of his claims, Bey cannot "explain how his claim would be advanced by an evidentiary hearing." *See Campbell,* 209 F.3d at 287. As explained, *supra,* most of Bey's claims are procedurally defaulted. State courts have addressed each of his other claims on their merits, leaving no factual disputes to be resolved. Bey's request for an evidentiary hearing is therefore denied.

Accordingly, I make the following:

### *RECOMMENDATION*

AND NOW, this 30th day of December, 2014, it is respectfully recommended that the petition for a writ of habeas corpus be DENIED with prejudice. It is further recommended that there is no probable cause to issue a certificate of appealability.[8] The petitioner may file objections to this Report and Recommendation within fourteen days after being served with a copy thereof. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights. *See Leyva v. Williams,* 504 F.3d 357, 364 (3d Cir.2007).

Dec. 30, 2014.

**All Citations**

Slip Copy, 2015 WL 4130358

2015 WL 4130358

1   I adopt the facts in the Report and Recommendation as discussed on pages 1–3 and 17–25 and agree with Magistrate Judge Rice's conclusion that the state court's determination that there was overwhelming evidence of guilt was not unreasonable. I adopt the conclusion in the Report and Recommendation that many of the trial counsel ineffective assistance of counsel claims are procedurally defaulted. To the extent that any of Petitioner's ineffective assistance of trial counsel claims are not procedurally defaulted, there is no reasonable probability that the outcome of the trial would have been different because there was overwhelming evidence of guilt. Thus, Petitioner cannot succeed on his ineffective assistance of trial counsel claims because he cannot establish that he suffered prejudice.

1   Thompkins was not the only source of this information; Detective Mosley also testified that all three were from South Philadelphia. N.T. 12/13/05 at 187–88.

2   Bey's further arguments, that the evidence was improperly admitted for the purpose of explaining Thompkins' contradictory opinions, addresses state court rulings that are unreviewable under habeas. *Estelle,* 502 U.S. at 67.

3   Under Pennsylvania law, jurors can be instructed that certain eyewitness identifications—obstructed by, inter alia, dim lighting or other listed conditions—may be received with caution, pursuant to *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (Pa.1954).

4   He also contends PCRA counsel ineffectively focused on the wrong language—the "statement of fact" language, instead of the "may not be received with caution" language—when making the constitutional argument to the state courts. Habeas Br. at 53. Regardless which phrase in the *Kloiber* instruction is challenged, however, the jury instructions must be viewed as a whole. *Boyde v. California,* 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

5   An equal protection claim based on a prosecutor's alleged striking of potential jurors for discriminatory reasons is commonly called a *Batson* claim pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Court set forth the following three-step, burden-shifting procedure for addressing such claims: (1) the defendant must establish a prima facie case of purposeful discrimination by the prosecution; (2) if this showing is made, the prosecution must provide race-neutral reasons for her strikes; and (3) the trial court then must determine whether the defendant has shown purposeful discrimination. *Id.* at 96–98. An objection by the defendant is necessary to assess the claim, and preserve it for appellate and federal review. *See Abul–Jamal v. Horn,* 520 F.3d 272, 284 (3d Cir.2008), vacated on other grounds by *Beard v. Abu Jamal,* 558 U.S. 1143, 130 S.Ct. 1134, 175 L.Ed.2d 967 (2010).

6   Here, the Commonwealth's pattern of using the first eight of its consecutive peremptory strikes to exclude women is "certainly strong enough to suggest an intention of keeping [women] off the jury." *Holloway,* 355 F.3d at 722; *see also Brinson,* 398 F.3d at 233; *Jones v. Ryan,* 987 F.2d 960, 971 (3d Cir.1993) (finding a prima facie case of discrimination where a prosecutor used three of four peremptory strikes against African Americans and the jury ultimately included one African American). Accordingly, clearly established Supreme Court precedent in *J.E.B.* obligated the state courts to require the prosecutor to state the reasons for his strikes.

7   Moreover, Bey's second claim misrepresents the prosecutor's argument by taking it out of context. N.T. 12/14/05 at 207 (the prosecutor answers his own rhetorical question, immediately after posing it, by referencing Bey's lawyer's argument —i.e. suggesting Bey provided an answer to the question without testifying—and then analyzes that argument to advance his own theory of the case).

8   Jurists of reason would not debate my recommended procedural or substantive dispositions of the petitioner's claims. *See Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Therefore, no certificate of appealability should be granted. *See id.*

---

End of Document                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

CLOSED,APPEAL,HABEAS

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:13−cv−05848−AB

BEY v. FOLINO et al
Assigned to: HONORABLE ANITA B. BRODY
Case in other court: THIRD CIRCUIT COURT OF APPEALS,
                15−02863
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 10/04/2013
Date Terminated: 07/10/2015
Jury Demand: None
Nature of Suit: 530 Habeas Corpus:
(General)
Jurisdiction: Federal Question

**Petitioner**

**SALEEM BEY**

represented by **MICHAEL WISEMAN**
POBOX 120
SWARTMORE, PA 19081
215−450−0903
Email: wiseman_law@comcast.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**LOUIS FOLINO**

represented by **JOHN W. GOLDSBOROUGH**
DISTRICT ATTORNEY'S OFFICE
Federal Litigation Unit
THREE SOUTH PENN SQUARE
PHILADELPHIA, PA 19107−3499
215−686−5706
Fax: 215−686−5725
Email: john.goldsborough@phila.gov
*ATTORNEY TO BE NOTICED*

**Respondent**

**THE DISTRICT ATTORNEY OF
THE COUNTY OF PHILADELPHIA**

represented by **JOHN W. GOLDSBOROUGH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Respondent**

**THE ATTORNEY GENERAL OF
THE STATE OF PA**

represented by **JOHN W. GOLDSBOROUGH**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/04/2013 | 1 | PETITION for Writ of Habeas Corpus ( Filing fee $ 5 receipt number PPE089481), filed by SALEEM BEY; Memo of Law. (Attachments: # 1 Petition part 2)(jmv, ) (Attachment 1 replaced on 3/12/2014) (admin1, ). (Main Document 1 replaced on 3/12/2014) (admin1, ). (Entered: 10/07/2013) |
| 11/04/2013 | 2 | ORDER THAT THE ABOVE CAPTIONED MATTER IS REFERRED TO THE HONORABLE TIMOTHY R. RICE, UNITED STATES MAGISTRATE JUDGE FOR A REPORT AND RECOMENDATION. SIGNED BY HONORABLE ANITA B. BRODY ON 11/4/13. 11/15/13 ENTERED AND COPIES E−MAILED. (jpd) (Entered: 11/05/2013) |
| 11/08/2013 | 3 | ORDER THAT THE DISTRICT ATTORNEY OF PHILADELPHIA COUNTY SHALL FILE SPECIFIC AND DETAILED ANSWER TO THE HABEAS PETITION WITHIN 45 DAYS OF THE DATE OF THIS ORDER. THE CLERK OF |

**A-021**

| | | COURT OF CCP–PHILA. COUNTY SHALL FILE WITH THE CLERK OF THIS COURT COPIES OF ALL RECORDS, INCLUDING TRANSCRIPTS OF NOTES OF TESTIMONY AT ARRAIGNMENT, TRIAL, SENTENCING, SUPPRESSION HEARINGS, POST CONVICTION HEARINGS, PETITIONS, PLEADINGS, OPINIONS AND BRIEFS OF STATE COURT PROCEEDINGS IN THE MATTER OF COMMONWEALTH v. BEY, COURT OF COMMON PLEAS OF PHILADELPHIA,CP–51–CR–1209051–2001, CP–51–CR–1206691–2001 WITHIN 45 DAYS OF THE DATE OF THIS ORDER. PRISONER STATE RECORD DUE BY 12/24/2013.. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 11/8/13. 11/8/13 ENTERED AND COPIES MAILED UNREP PARTIES, MAILED AND E–MAILED TO COUNSEL AND FAXED TO CCP–PHILA.(pr, ) Modified on 11/8/2013 (pr, ). Modified on 11/8/2013 (pr, ). (Entered: 11/08/2013) |
|---|---|---|
| 12/06/2013 | | State Court Record received on 12/6/13 and forwarded to the chambers of the Honorable Timothy R. Rice, United States Magistrate Judge. (jpd) (Entered: 12/06/2013) |
| 12/10/2013 | 4 | RECEIPT OF STATE COURT RECORD ON 12/10/13 BY THE CHAMBERS OF THE HONORABLE TIMOTHY R. RICE, UNITED STATES MAGISTRATE JUDGE. (jpd, ) (Entered: 12/10/2013) |
| 12/23/2013 | 5 | MOTION *(UNOPPOSED) MOTION FOR EXTENSION OF TIME TO FILE RESPONSE TO PETITION FOR WRIT OF HABEAS CORPUS* filed by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA..Motions referred to TIMOTHY R. RICE.(GOLDSBOROUGH, JOHN) (Entered: 12/23/2013) |
| 12/23/2013 | 6 | ORDER THAT THE RESPONDENTS' TIME FOR FILING A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IS EXTENDED NINETY (90) DAYS UNTIL 3/22/2014. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 12/23/13. 12/24/13 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 12/24/2013) |
| 03/19/2014 | 7 | MOTION for Extension of Time to File Response/Reply , *Unopposed, to Petition for Writ of Habeas Corpus* filed by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA.Certificate of Service.Motions referred to TIMOTHY R. RICE.(GOLDSBOROUGH, JOHN) (Entered: 03/19/2014) |
| 03/25/2014 | 8 | ORDER THAT RESPONDENTS' UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE A RESPONSE IS GRANTED. RESPONDENTS' DEADLINE FOR FILING A RESPONSE IS EXTENDED UNTIL 5/6/2014. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 3/25/14. 3/26/14 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 03/26/2014) |
| 05/06/2014 | 9 | MOTION for Extension of Time to File Response/Reply , *Unopposed, to Petition for Writ of Habeas Corpus* filed by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA.Certificate of Service.Motions referred to TIMOTHY R. RICE.(GOLDSBOROUGH, JOHN) (Entered: 05/06/2014) |
| 05/08/2014 | 10 | ORDER THAT THE RESPONDENTS' UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE A RESPONSE TO THE PETITION FOR WRIT OF HABEAS CORPUS IS GRANTED AND RESPONDENTS DEADLINE FOR FILING IS EXTENDED BY ONE WEEK UNTIL 5/13/2014. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 5/7/14. 5/8/14 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 05/08/2014) |
| 05/13/2014 | 11 | Response *to Petition for Writ of Habeas Corpus* by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H) (GOLDSBOROUGH, JOHN) (Entered: 05/13/2014) |
| 05/29/2014 | 12 | MOTION for Extension of Time to File Response/Reply filed by SALEEM BEY..Motions referred to TIMOTHY R. RICE. (Attachments: # 1 Text of Proposed Order)(WISEMAN, MICHAEL) (Entered: 05/29/2014) |

**A-022**

| 05/30/2014 | 13 | ORDER THAT THE PETITIONER'S UNOPPOSED MOTION FOR A SIXTY DAY EXTENSION OF TIME TO FILE A REPLY IS GRANTED. THE PETITIONER MAY FILE HIS REPLY ON OR BEFORE 7/29/14. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 5/29/14.5/30/14 ENTERED & E–MAILED.(fdc) (Entered: 05/30/2014) |
|---|---|---|
| 07/28/2014 | 14 | MOTION for a Final Nine Day Extension of Time to File *Reply* filed by SALEEM BEY, certificate of service. Motions referred to TIMOTHY R. RICE. (Attachments: # 1 Text of Proposed Order)(WISEMAN, MICHAEL) Modified on 7/30/2014 (fb). (Entered: 07/28/2014) |
| 08/07/2014 | 15 | *Petitioner's Reply Memo In Support of Petition for Writ of Habeas Corpus* by SALEEM BEY. (WISEMAN, MICHAEL) Modified on 8/8/2014 (fb). (Entered: 08/07/2014) |
| 08/13/2014 | 16 | *Notice of Supplemental Authority* by SALEEM BEY (Attachments: # 1 Exhibit Opinion in Cox v. Horn)(WISEMAN, MICHAEL) Modified on 8/15/2014 (fb). (Entered: 08/13/2014) |
| 08/15/2014 | 17 | Response *(Sur–Reply)* by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA. (GOLDSBOROUGH, JOHN) (Entered: 08/15/2014) |
| 09/03/2014 | 18 | *Petitioner's Response to Commonwealth's Sur–Reply* by SALEEM BEY. (WISEMAN, MICHAEL) Modified on 9/4/2014 (fb). (Entered: 09/03/2014) |
| 10/10/2014 | 19 | ORDER THAT PETITIONER'S MOTION FOR A NINE DAY EXTENSION OF TIME TO FILE A REPLY (DOC. NO. 14) IS GRANTED. PETITIONER'S REPLY FILED ON 8/7/14 (DOC. NO. 15) AND ALL ADDITIONAL BRIEFING SHALL BE CONSIDERED IN ASSESSING PETITIONER'S HABEAS CLAIMS. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 10/10/14.10/10/14 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 10/10/2014) |
| 12/31/2014 | 20 | REPORT AND RECOMMENDATION THAT THE PETITION FOR WRIT OF HABEAS CORPUS BE DENIED WITH PREJUDICE AND IT IS FURTHER RECOMMENDED THAT THERE IS NO PROBABLE CAUSE TO ISSUE A CERTIFICATE OF APPEALABILITY. SIGNED BY MAGISTRATE JUDGE TIMOTHY R. RICE ON 12/30/14. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order, # 3 RR Ntc) 12/31/14 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 12/31/2014) |
| 01/06/2015 | 21 | MOTION for Extension of Time to File *Objections to Report and Recommendation* filed by SALEEM BEY.Objections to Report and Recommendation. (Attachments: # 1 Text of Proposed Order)(WISEMAN, MICHAEL) (Entered: 01/06/2015) |
| 01/13/2015 | 22 | ORDER – UPON CONSIDERATION OF PETITIONER'S UNOPPOSED MOTION FOR A FORTY FIVE DAY EXTENSION OF TIME TO FILE OBJECTIONS, IT IS HEREBY ORDERED: THE MOTION IS GRANTED. PETITIONER SHALL FILE HIS REPLY ON OR BEFORE FEBRUARY 23, 2015. SIGNED BY HONORABLE ANITA B. BRODY ON 1/12/2015.1/13/2015 ENTERED AND COPIES VIA ECF.(mo, ) (Entered: 01/13/2015) |
| 01/13/2015 | | Set/Reset Deadlines as to REPLIES DUE BY 2/23/2015. (mo, ) (Entered: 01/13/2015) |
| 02/20/2015 | 23 | Second MOTION for Extension of Time to File *Objectins* filed by SALEEM BEY.. (Attachments: # 1 Text of Proposed Order)(WISEMAN, MICHAEL) (Entered: 02/20/2015) |
| 02/23/2015 | 24 | ORDER – UPON CONSIDERATION OF PETITIONER'S UNOPPOSED MOTION FOR A FIVE DAY EXTENSION OF TIME TO FLE OBJECTIONS, IT IS HEREBY ORDERED: THE MOTION IS GRANTED. PETITIONER SHALL FILE OBJECTIONS ON OR BEFORE FEBRUARY 27, 2015.. SIGNED BY HONORABLE PAUL S. DIAMOND AS EMERGENCY JUDGE FOR THE HONORABLE ANITA B. BRODY ON 2/23/2015.2/23/2015 ENTERED AND COPIES VIA ECF.(mo, ) Modified on 2/25/2015 (mo, ). (Entered: 02/23/2015) |
| 02/23/2015 | | Set/Reset Deadlines as to 20 REPORT AND RECOMMENDATIONS re 1 Petition for Writ of Habeas Corpus, filed by SALEEM BEY. OBJECTIONS TO R&R DUE BY |

**A-023**

| | | 2/27/2015 (lvj, ) (Entered: 02/24/2015) |
|---|---|---|
| 02/24/2015 | 25 | (Court Only) Civ624 Notice to the Court regarding Report and Recommendation.(jpd, ) (FILED IN ERROR) (Entered: 02/25/2015) |
| 02/27/2015 | 26 | Objections by SALEEM BEY *to Magistrate's Report and Recommendation*. (WISEMAN, MICHAEL) (Entered: 02/27/2015) |
| 02/27/2015 | 27 | (Court Only) Civ624 Notice to the Court regarding Report and Recommendation.(jpd, ) (Entered: 02/27/2015) |
| 03/10/2015 | 28 | MOTION *(Unopposed) Motion for Extension of Time to File Response to Objections* filed by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA..(GOLDSBOROUGH, JOHN) (Entered: 03/10/2015) |
| 03/12/2015 | 29 | ORDER that RESPONDENTS' UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE A RESPONSE TO PETITIONER'S OBJECTIONS IS GRANTED, AND RESPONDENTS' DEADLINE FOR FILING IS EXTENDED BY 45 DAYS, UNTIL APRIL 27, 2015.. SIGNED BY HONORABLE ANITA B. BRODY ON 3/11/2015.3/12/2015 ENTERED AND COPIES VIA ECF.(mo, ) (Entered: 03/12/2015) |
| 03/12/2015 | | Set/Reset Deadlines as to RESPONSES DUE BY 4/27/2015. (mo, ) (Entered: 03/12/2015) |
| 04/27/2015 | 30 | Response *to Objections* by LOUIS FOLINO, THE ATTORNEY GENERAL OF THE STATE OF PA, THE DISTRICT ATTORNEY OF THE COUNTY OF PHILADELPHIA. (GOLDSBOROUGH, JOHN) (Entered: 04/27/2015) |
| 05/22/2015 | 31 | Petitioner's Reply to Respondents' Response to Petitioner's Objections 30 to Report and Recommendation by SALEEM BEY, CERTIFICATE OF SERVICE. (WISEMAN, MICHAEL) Modified on 5/26/2015 (afm, ). (Entered: 05/22/2015) |
| 07/09/2015 | 32 | ORDER THAT THE REPORT AND RECOMMENDATION IS APPROVED AND ADOPTED; THE PETITION FOR WRIT OF HABEAS CORPUS IS DENIED AND DISMISSED; THERE IS NO BASIS FOR THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY. SIGNED BY HONORABLE ANITA B. BRODY ON 7/9/15. 7/9/15 ENTERED AND COPIES E–MAILED. (jpd) (Entered: 07/09/2015) |
| 08/03/2015 | 33 | NOTICE OF APPEAL by SALEEM BEY. Copies to Judge, Clerk USCA, Appeals Clerk (WISEMAN, MICHAEL) Modified on 8/4/2015 (nd, ). Modified on 8/6/2015 (td, ). (Entered: 08/03/2015) |
| 08/04/2015 | 34 | Clerk's Notice to USCA re 33 Notice of Appeal : (jpd, ) (Main Document 34 replaced on 8/6/2015) (jpd, ). (Entered: 08/05/2015) |
| 08/06/2015 | | NOTICE of Docketing Record on Appeal from USCA re 33 Notice of Appeal filed by SALEEM BEY. USCA Case Number 15–2863 (jpd, ) (Entered: 08/06/2015) |
| 08/10/2015 | | USCA Appeal Fees received $ 505 receipt number 125684 re 33 Notice of Appeal filed by SALEEM BEY (amas) (Entered: 08/10/2015) |

**A-024**

ALD-140                                          February 11, 2016
**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

No. **15-2863**

SALEEM BEY, Appellant

v.

SUPERINTENDENT GREENE SCI, et al.

(E.D. Pa. Civ. No. 2-13-cv-05848)

Present:      AMBRO, SHWARTZ and GREENBERG, <u>Circuit</u> <u>Judges</u>

Submitted are:

(1)    Appellant's request for a certificate of appealability under 28 U.S.C.
       § 2253(c)(1);

(2)    Appellant's motion to accept noncompliant filing; and

(3)    Appellees' response in opposition to a certificate of appealability

in the above-captioned case.

Respectfully,

Clerk

MMW/CAD/tyw
_____ **O R D E R** _____

Bey's application for a certificate of appealability is granted on the following issues:
(1) whether Bey's trial attorney was ineffective for failing to object to a faulty <u>Kloiber</u>
instruction ("Claim Two" below), <u>see</u> <u>Commonwealth v. Kloiber</u>, 106 A.2d 820 (Pa.
1954); (2) whether any procedural default of that issue should be excused because post-
conviction counsel was ineffective for failing to properly argue the issue of trial attorney
ineffectiveness, <u>see</u> <u>Martinez v. Ryan,</u> 132 S. Ct. 1309, 1320 (2012); (3) whether Bey's

(Continued)

**A-025**

ALD-140
Page 2
Saleem Bey v. Supt. Greene SCI
C.A. No. 15-2863

_____

_____ **O R D E R** _____

trial attorney was ineffective for failing to object on proper grounds to the prosecutor's comments on Bey's post-arrest, post-<u>Miranda</u> silence ("Claim Four" below), <u>see</u> <u>Doyle v. Ohio</u>, 426 U.S. 610 (1976); <u>Government of Virgin Islands v. Davis</u>, 561 F.3d 159 (3d Cir. 2009); and (4) whether the procedural default of that issue should be excused because post-conviction counsel was ineffective for failing to raise the issue, <u>see</u> <u>Martinez</u>, 132 S. Ct. at 1320.  A certificate of appealability is denied as to the remaining claims.  Jurists of reason would not debate the District Court's conclusion that Bey did not show that his Sixth Amendment right to the effective assistance of counsel was violated with regard to those remaining claims.  <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003); <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 694 (1984).  In particular, because the evidence was admissible under state law, jurists of reason would not debate whether Bey's attorney was ineffective when he failed to object to admission of evidence of extraneous violence.  <u>See</u> <u>Real v. Shannon</u>, 600 F.3d 302, 309 (3d Cir. 2010) (attorney is not ineffective for failing to make a meritless objection).  And jurists of reason would not debate whether Bey's claim that trial counsel was ineffective for failing to object to an incomplete jury instruction regarding Bey's failure to testify was procedurally defaulted, and that ineffectiveness of post-conviction counsel could not excuse the default because the claim is not substantial.  <u>See</u> <u>Martinez</u>, 132 S. Ct. at 1320.  Appellant's motion for leave to file an application for a certificate of appealability in excess of twenty pages is granted.


By the Court,

s/ Thomas L. Ambro, Circuit Judge

Dated:        February 17, 2016
tyw/cc:      Michael Wiseman, Esq.
             John W. Goldsborough, Esq.


**A-026**